[S. F. No. 1467. Department One.—June 5, 1899.]

In the Matter of the Estate of CHARLES A. JAMES, Deceased. LAURA MILEN JAMES et al., Appellants, v. P. M. JAMES et al., Respondents.

ADMISSION OF IMPROPER EVIDENCE—APPEAL—REVERSAL.—The admission of improper evidence, under objection, which tends in any degree to affect the final conclusion of the court, is ground for reversal of the judgment upon appeal, and for ordering a new trial, notwithstanding there may be sufficient other evidence in the record to support the findings of fact.

ID.— IMPROPER IMPEACHMENT—SPECIFIC ACTS OF IMMORALITY.— Specific acts of immorality cannot be shown to impeach a witness; and where evidence thereof does not tend to shed light upon the issues tried, and is calculated to besmirch the character of material witnesses, and to weaken their credibility, its admission is prejudicial error.

ID.—IMPEACHMENT OF TESTIMONY AS TO MARRIAGE—IMMORAL BOOK—IMMORAL CONDUCT OF ALLEGED WIFE.—Where a mother and daughter were sole witnesses to the marriage of the daughter with a

deceased person, they cannot be impeached by evidence of a highly immoral book shown to have been written by the mother and read by the daughter, and to have been suppressed by the Society for the Suppression of Vice; nor is evidence admissible to show immoral conduct on the part of the alleged wife with other men prior to the alleged marriage.

ID.—HEARSAY EVIDENCE—DECLARATIONS OF RELATIVES—ENGAGEMENT OF MARRIAGE—RES GESTAE.—Declarations of relatives of the alleged wife, made after the death of the alleged husband, and not within her hearing, to the effect that she was engaged to be married to him at the time of his death, and offered to show the nonexistence of a marriage between them, relate to past matters, and are no part of the *res gestae*, but are inadmissible hearsay, as against the alleged widow and child of the deceased. Declarations of members of a family, who are not parties to the litigation, as to such matters, are no more admissible than the declarations of strangers.

ID.—DECLARATIONS AS TO PEDIGREE—INAPPLICABLE RULE.—The rule as to the admissibility of declarations upon matters of family pedigree and kindred subjects cannot be invoked, where the parties making the declarations are neither deceased nor beyond the jurisdiction of the court.

ID.—DECLARATIONS OF CO-CONSPIRATORS—CONSPIRACY NOT SHOWN.—The declarations of the relatives of the alleged wife are not admissible as those of co-conspirators with her to impose upon the estate of the deceased, where there is not sufficient evidence of a conspiracy between them to justify the admission of the evidence on that ground.

ID.—DECLARATIONS OF DECEASED—NONMARRIAGE—PHYSICAL CONDITION.—Voluntary declarations made by the deceased not long before his death that he was a widower, and that he had dropsy, catarrh, and symptoms of Bright's disease, and was impotent, necessarily covered his condition for a past period, and are not admissible as *res gestae;* nor are they admissible as declarations of a member of a family to show nonmarriage to the alleged wife; but they are inadmissible hearsay as against her and an alleged posthumous child of the deceased by her.

ID.—EXPERT EVIDENCE—MEDICAL WITNESSES.—The expert evidence of medical witnesses based only upon the inadmissible declarations of the deceased as to his physical condition and symptoms, have no basis, and are wholly inadmissible.

APPEAL from a decree of distribution of the estate of a deceased person made by the Superior Court of the City and County of San Francisco and from an order denying a new trial. J. V. Coffey, Judge.

The facts are stated in the opinion of the court.

William H. H. Hart, George W. Fox, and Aylett R. Cotton, for Appellants.

George D. Shadburne, for Respondents.

GAROUTTE, J.—The appellants, claiming to be the widow and son of Dr. Charles James, deceased, appeal from a decree of distribution made and entered in the matter of his estate, and from an order denying their motion for a new trial. Dr. James died leaving quite a large property, and Laura Milen James now claims to be his widow, and Theodore Milen James, the infant son of Laura, claims by guardian to be his son. The marriage relied upon is commonly called a contract marriage, and is evidenced by an agreement in writing purporting to be signed by both parties named therein. The lower court, after an extended trial, found as a fact that there never was a marriage between Dr. James and Laura Milen, and that her infant son was not his son.

It is first contended upon the part of the respondents that there is sufficient evidence in the record, which came before the court without objection, to support the findings of fact, and that, therefore, even conceding the admission of evidence under objection which should have been denied admission, still a new trial for the aforesaid reasons should not be ordered. This position cannot be sustained. If improper evidence under objection has been admitted, it is impossible for this court to say how much weight and influence it had in the mind of the trial court in framing its findings of fact. The improperly admitted evidence may have been all-powerful to that effect. As far as this court knows it may have been that particular evidence which turned the scale and lost the case to the appellants. This must of necessity be the rule wherever improper evidence has been admitted which upon its face tends in any degree to affect the final conclusion of the court. Counsel for appellants present an elaborate brief wherein they discuss the claimed errors of law committed by the trial court in the admission of evidence. Counsel for respondents present an elaborate reply brief, wherein they discuss at great length the sufficiency of the evidence to support the findings, and devote but little time and space to the discussion of the alleged errors of

law relied upon by the other side. It would have been more satisfactory to this court if they had devoted more labor to the questions of law raised by appellants in their brief.

Before passing to an examination of the merits of the motion for a new trial, let us look at the parties directly and indirectly connected with this litigation, their situation and relations. Dr. Charles James, sixty years of age, was the owner of a large apartment house, situated upon Howard street, in the city of San Francisco. Dr. Milen, a traveling vendor of drugs, his second wife Jessie Milen, his daughter by his first wife, and her husband (Mr. and Mrs. Dickman), and Laura Milen, his unmarried daughter, sister to Mrs. Dickman and nineteen years of age, rented rooms of Dr. James in his apartment house, on December 13, 1894. Prior to this event the family of Dr. Milen were strangers to Dr. James. Here Dr. James and Laura met. Little time was devoted to courtship, for the contract of marriage between them is dated January 6, 1895, and according to the testimony of Laura it was executed at that date, and the marriage relations thereupon immediately assumed. Dr. James died at his rooms in this house January 28, 1895, after a very short illness. An infant, Theodore Milen, joint defendant and appellant with his mother Laura, was born to her September 16, 1895.

During the examination of Dr. Milen he identified a book entitled "Was He to Blame?" as written by his wife, Mrs. Jessie Milen. This book was highly immoral and was introduced in evidence under objection. This evidence was thereafter followed by respondents with evidence that Laura Milen had read the book, and also the additional evidence that it had been subsequently suppressed by the Society for the Suppression of Vice. As evidence tending to besmirch the character of the author, and also that of the daughter, these facts were well calculated to serve that end. And in serving that end it necessarily had the effect of weakening the credibility of these two witnesses— the two most important witnesses to the fact of marriage. It therefore goes without saying that it was prejudicial to the appellants' side of the case. To support the admissibility of this evidence, upon the ground that it tended to weaken or impeach the credibility of these two aforesaid witnesses, no au-

thority can be cited. The book was a separate, distinct, independent piece of evidence, and all authorities agree that independent, specific acts of immorality may not be affirmatively shown to impeach a witness. It has been declared by this court that such acts may not even be shown upon the cross-examination of the witness himself; and even those cases which go to the length of holding that such an examination of the witness may be gone into upon cross-examination still declare that the answer of the witness is final and conclusive, and its truthfulness beyond all attack by independent evidence. We cite numerous cases to support the foregoing propositions: *Sharon v. Sharon*, 79 Cal. 673; *Hinkle v. San Francisco R. R. Co.*, 55 Cal. 627; *People v. Hamblin*, 68 Cal. 101; *People v. Elster*, 3 West Coast Rep. 37; *Evans v. DeLay*, 81 Cal. 105; *People v. O'Brien*, 96 Cal. 180; *People v. Un Dong*, 106 Cal. 88; *People v. Wells*, 100 Cal. 462; *Jones v. Duchow*, 87 Cal. 109; *Pyle v. Piercy*, 122 Cal. 383; *People v. Silva*, 121 Cal. 668; Code Civ. Proc., sec. 2051. This section of the code expressly forbids the impeachment of a witness "by evidence of particular wrongful acts."

Respondent's counsel claim that this evidence was offered to contradict the testimony of Dr. and Mrs. Milen as to the pure surroundings and education of their daughter Laura. All the testimony of Dr. Milen in chief upon this point is as follows: "I have bestowed all I could in the way of care over her books and education; I have not been able to provide all the books I have wished for them at home. I do not know that I ever gave my wife any instructions about the moral culture of my children; I considered that she was competent to care for them in that respect, so I did not consider it necessary to leave any instructions." Mrs. Milen gave no testimony whatever on the subject. Respondents claim that there was neither a marriage between this man and woman, nor meretricious relations; and that the whole thing was without any semblance of truth, and was a corrupt scheme pure and simple, concocted after the old man's death, by which to secure the possession of his property. Aside from the question of impeachment, which we have already considered, this evidence is wholly inadmissible from any standpoint. The fact that the stepmother wrote an immoral book, and that appellant, the daughter, read it, shed no light

upon the all-important issue in the case, namely, marriage or
no marriage. There is nothing in the record to indicate that
Dr. James, prior to his death, had any knowledge as to the au-
thorship of the book, or that Laura had read it, or that there
was such a book. Therefore, as in any way bearing upon the
question of marriage, this evidence failed to reach the mark.
It does not even contradict the testimony of her father which
we have quoted above.

The trial court admitted in evidence the declarations of Mrs.
Milen and Mr. and Mrs. Dickman, made after the death of Dr.
James, to the butcher, the baker and the coal dealer, not in the
presence of Laura Milen, to the effect that Laura was engaged
to be married to the doctor at the time of his death. This evi-
dence was not offered for impeachment purposes, for no founda-
tion had been laid for it when the respective witnesses were testi-
fying upon the stand; but, upon the contrary, it was offered
and received as independent and affirmative evidence tending to
show the nonexistence of a marriage between the parties. Un-
der well-settled rules of law, the evidence was objectionable. It
was hearsay of the purest character, and does not come within
any of the exceptions recognizing the admissibility of that char-
acter of evidence. These appellants could not be bound to the
extent of a hair by the declarations of third parties. It is
claimed by respondents that these witnesses were members of
the Milen family, and that declarations of any member of the
family are admissible as part of the *res gestae.* This claim, as
presenting a rule of evidence, is untenable. What third par-
ties may say as to the character of a past occurrence, or as to
the actual happening or nonhappening of an occurrence, will
not be stamped by the law as *res gestae.* The fact that these
parties may all be said to have been members of the Milen fam-
ily gives no additional support to respondents' position. Decla-
rations of members of a family, who are not parties to the liti-
gation, as to matters similar to those before us, are no more ad-
missible than the declarations of strangers. The rule of law
as to the admissibility of declarations of certain described per-
sons, when those declarations bear upon matters of pedigree and
kindred subjects, cannot be invoked here, for the reason that
the parties making the declarations are neither deceased nor

beyond the jurisdiction of the court. (*People v. Mayne*, 118 Cal. 516; 62 Am. St. Rep. 256.) It is also claimed that these witnesses were co-conspirators with the appellant Laura, and that as such conspirators their declarations were admissible. There is not sufficient evidence in the record of a conspiracy between these parties to justify the admission of the evidence upon that ground. As to the declarations of Laura, the appellant, they were admissible against her at least.

Declarations made by the deceased, Dr. James, within a few weeks prior to his death, and within the time when the appellant, Laura, claims she was his wife, were admitted in evidence under objection. These declarations were testified to by various neighbors and friends of the doctor, and covered a wide field. The most important ones were to the effect that he was a widower, that he had dropsy, catarrh, and symptoms of Bright's disease, and that he was impotent. We are satisfied that the rules of evidence forbid the introduction of this kind of evidence. It is not *res gestae;* neither does it belong to that class of hearsay which the law recognizes as competent and admissible evidence.

This evidence is not *res gestae.* Section 1850 of the Code of Civil Procedure fairly covers those cases where declarations form part of the *res gestae,* and here we have no such case. That section provides: "Where, also, the declaration, act, or omissions forms part of a transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act, or omission is evidence, as part of the transaction." These declarations are no part of a transaction. They are substantive, independent statements of the existence of certain facts. The unsworn statement of Dr. James that he had Bright's disease, or dropsy, or catarrh cannot be held to prove that fact. If such were the law, a man being dead, the floodgates for perjured testimony would be lifted to their fullest extent. These declarations of James as to his various bodily afflictions were in no sense those of a patient to his physician. Neither were they those involuntary and spasmodic exclamations of an injured man as to his physical pains made at the time of the injury. These declarations of the deceased were not involuntary exclamations. They were made deliberately and calmly, and neces-

sarily covered the health of the deceased for a past period of time. The true rule upon this question is stated in *Roosa v. Boston Loan Co.*, 132 Mass. 439: "When the bodily or mental feelings of the party are to be proved, his exclamations or expressions indicating present pain or malady are competent evidence; and in *Bacon v. Charlton*, 7 Cush. 581, 586, where this rule is stated, it was said by the court: 'Such evidence, however, is not to be extended beyond the necessity on which the rule is founded. Anything in the nature of narration or statement is to be carefully excluded, and the testimony is to be confined strictly to such complaints, exclamations, and expressions as usually and naturally accompany and furnish evidence of a present existing pain or malady.' "

We find analogous principles discussed in many cases upon contest of the probate of wills, where contestants have claimed the testator never signed the instrument, or that he signed it under duress or menace. In such cases it has always been held that the declarations of the testator as to menace or duress, or as to the fact of his signature, are hearsay, and cannot be received in evidence. If the issue is will or no will, and the testator's declarations may not be received to indicate the truth, how may the declarations of Dr. James be received upon the issue of marriage or no marriage, or potency or impotency? The cases appear entirely similar in principle. Such declarations are held to be "mere hearsay evidence which, by reason of the death of the party whose statement is offered, can never be explained or contradicted by him." (*Griffith v. Diffenderffer*, 50 Md. 480.) One of the important questions in *Boylan v. Meeker*, 28 N. J. L. 274, bore upon the matter of the forgery of a will; and the declarations of the alleged testator to the effect that he had never made a will were rejected as hearsay evidence. In the case of *In re Calkins*, 112 Cal. 300, in speaking as to the declarations of a testatrix, a contest of the probate of her will being the matter in litigation, this court said: "But to the extent that they purported to be declarations of the acts of others or of her own acts, they were but matters of hearsay merely, whose truth rested in the veracity of the utterer, and upon which there was no opportunity of cross-examination, or of explanation by the party who had uttered them, and were not entitled to any weight by

the jury, and cannot be considered for the purpose of sustaining their verdict."

Section 1852 of the Code of Civil Procedure provides: "The declaration, act, or omission of a member of a family who is a decedent, or out of the jurisdiction, is also admissible as evidence of common reputation, in cases where, on questions of pedigree, such reputation is admissible." It is now contended that the declarations of Dr. James that he was not married are admissible under the provisions of the foregoing section. But this cannot be so, for the reason that such declarations must come from a member of a family; and the whole case of respondents rests upon the claim that James was not a member of the Milen family. He was not a member of Laura Milen's family unless he was her husband, and that is the sole point involved in this litigation. *Pearson v. Pearson,* 46 Cal. 610, is much relied upon to support the admissibility of these declarations. But that was a case coming directly within the provisions of the section quoted, and the declarations were admitted by virtue of the law there declared. The declarations were there made by the testator in his will, to the effect that certain parties therein named were his wife and his children. These declarations comprised all the evidence upon the question, and were held by this court sufficient to prove the facts embodied therein. The entire opinion of the court concedes that the testator was a member of the family comprised in part of the parties named in the will. The admissibility of pedigree evidence by declarations has for its only basis the close and intimate relations existing between the declarant and the party to whom the declarations pertain. The declarations, to be admissible, must not only be made by a deceased member of the family, but they must be made of and concerning a member of the same family. Here we have nothing of the kind. If a family relation be assumed to have existed between this man and this woman sufficient to justify the admission of his declarations after death as to the marriage relation existing between them, then the respondent's whole case falls to the ground; for there was no family relation between these two people, unless it was that of husband and wife. There is no pretense of any other.

Evidence came from one Lewis, under objection, to the effect

that some years prior to the date of the alleged marriage the appellant Laura had allowed herself to be fondled by him. Evidence of Mrs. Zollinger was also introduced, tending to show that appellant Laura had slept with a man at her house upon a certain night, some weeks prior to the alleged marriage. Nearly all that has been said as to the admissibility in evidence of the book entitled "Was He to Blame?" is entirely applicable here. These matters could not have been inquired into upon the cross-examination of the appellant Laura. Much less may they be proven as affirmative, independent evidence tending to blacken her character, and thus impeach her credibility as a witness. Upon matters of impeachment she has the same rights as any other witness. In the Sharon case, *supra,* it was held that questions calling for such evidence could not be addressed to the witness upon cross-examination. Specific acts of immorality cannot be proven to impeach a witness. We have already cited an army of cases to that effect. Even conceding the evidence of these two witnesses to be true, yet it in no way tends to prove that these parties did not enter into a marriage contract and thereafter live together as husband and wife.

Aside from the declarations of the deceased, James, there is no evidence that he was afflicted with any sort or kind of disease prior to his death. Those declarations have been held inadmissible. It therefore follows that all the expert evidence of medical gentlemen based upon his physical condition as declared by himself must be rejected. This necessarily follows, for there is no proper evidence in the record upon which to base expert medical testimony.

For the foregoing reasons the judgment and order are reversed and the cause remanded for a new trial.

Harrison, J., and Van Dyke, J., concurred.

Hearing in Bank denied.