[Crim. No. 5276. In Bank. Mar. 7, 1952.]

THE PEOPLE, Respondent, v. AURELIO MARTINEZ,
Appellant.

Robert H. Haden, Public Defender, and Ben Curry, Jr., for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant Aurelio Martinez was charged by information with the murder of his wife, Hope Martinez. He pleaded not guilty and not guilty by reason of insanity.

A jury returned a verdict of guilty of murder of the first degree without recommendation and found that defendant was sane at the time of commission of the offense. Defendant's motion for a new trial was denied and he was sentenced to death. The appeal to this court is automatic. (Pen. Code, § 1239.)

Defendant was 37 years old at the time of the homicide. He and his wife Hope had seven children. During the marriage he had many quarrels with Hope, and with her mother and stepfather with whom they resided in Tulare. Defendant threatened Hope, cursed her, and, on at least one occasion, beat her. On May 2, 1951, after a long argument with Hope and her mother, defendant moved out of the house. His mother-in-law had him arrested about this time but the judge released him after warning him to stay away from the house where Hope lived.

Thereafter, until the time of the killing, defendant lived alone in a house owned by his brother. He gave Hope about $40 a week from his earnings to support herself and the children and kept about $20 for himself. Hope made a lunch for him each day to take to work and did his laundry. About two weeks before the homicide defendant told a friend that some day "he was going to do something bad" to her.

On August 2, 1951, defendant and Hope quarreled again. He had come home from work and had no cigarettes or money. He asked Hope, who was on her way to the grocery store, to buy him a package of cigarettes. She refused, saying that she needed the money for milk for the baby and for doctor's bills. Defendant felt aggrieved that out of the $40 he had given her that week she refused to give him 15 cents for cigarettes. In the ensuing argument Hope said that she would no longer make defendant's lunch. A woman at the store said that "now somebody is going to see who is going to be the boss." It irritated defendant that three or four of defendant's friends overheard this remark. He cursed his wife and left. Later that day he borrowed money from a friend and bought a fifth of a gallon of wine. He returned to his room and drank the wine. He arose during the night, obtained a butcher knife and went to Hope's house with the intention, he testified, of "scaring" her. When he entered her bedroom, she screamed and aroused the house. In the excitement her hand was cut by the knife and defendant ran out of the house.

The next morning defendant walked over to Hope's house

and found that she had not left any lunch for him on the porch. He told the driver of the car who stopped by to take him to work, that he was staying home that day because he had "a little family trouble." He idled about town during the morning. He telephoned Hope, but she told him that she did not want him to bother her and hung up. Defendant drank two or three bottles of beer and bought a fifth of a gallon of wine. He returned to his room, lay in bed, and drank nearly all the wine.

Later in the day defendant's niece and another young girl looked in the bedroom window at defendant. He became enraged and rushed out to argue with the girls' parents. During this argument defendant was informed that the police were looking for him, since Hope had signed a complaint against him because of the knife incident. Defendant subsequently told an investigator that at that moment he made up his mind to "destroy" Hope.

Defendant left his room for the Montellano Store, a few blocks away. En route he picked up an empty lard can. When he approached the store he saw his sister-in-law Molly enter and followed her into the store. It was Molly's intention to call Hope to warn her to avoid defendant. Upon discovering that he was following her, she became frightened and left without calling Hope. After Molly left, defendant also left and went to the Morales Grocery Store. At the pump in front of the store he purchased enough gasoline to fill the lard can. He then walked over to Hope's house, carrying the can of gasoline, a small box of matches, and a stick.

When he entered the back door, his sister-in-law Jessie was calling the police because she had heard that defendant was coming for Hope. The occupants of the house were thrown into a panic. Hope ran out the front door as he came running through the kitchen. He followed her through the house, knocking Jessie down and spilling gasoline on a young girl who was in his way. He shouted in Spanish, "Hope, don't run, because any way I am going to destroy you." As Hope ran through the yard she stumbled over some corrugated metal and fell. Defendant was beside her in a moment and threw the gasoline over her. A woman neighbor who had come to the scene on hearing Hope's screams shouted twice, "Don't burn her up." Defendant ignored her. He struck one match, which failed to ignite. He lit a second match and threw it on Hope's gasoline-drenched

body. She caught on fire and at the same time the gasoline remaining in the can ignited, and defendant's clothes caught on fire. The neighbor who had attempted to stop defendant was slightly burned.

A witness who had been attracted by Hope's screams and was watching the scene in horror snatched a blanket from his car and threw it over Hope as she arose and started to run in flames. With the aid of other witnesses, the flames were extinguished with the blanket and dirt. Meanwhile, another passerby dragged a hose from a nearby house towards Hope. Defendant ran to the faucet, disconnected the hose, and got under the faucet to put out the fire on his own clothes. He made no effort to give Hope assistance. When the police arrived, Hope's relatives were beating defendant with sticks.

Hope was rushed to a hospital. Between 70 and 80 per cent of her body was covered with second and third degree burns. She died three days later. The doctor in attendance testified that the burns were the direct cause of her death.

Many witnesses testified to these events. Defendant testified in his own behalf and agreed in all material matters with the witnesses for the prosecution. When questioned on cross-examination concerning his state of mind preceding the slaying, defendant stated that when he purchased the gasoline, ''Well, I guess I just went up to see if I could burn myself and burn her too. But I don't know just—my mind was—I was just out of my mind.'' During his testimony defendant recalled all the events during the pursuit of his victim, the throwing of the gasoline, the striking of the two matches, and the burning of Hope and himself. His ability to remember details is significant in view of the contention that he was too drunk to premeditate the killing.

The first question presented is whether the evidence is sufficient to support a conviction of murder in the first degree. The instructions authorized the jury to return a verdict of first degree murder on one or both of two theories: the murder was willful, deliberate, and premeditated, or it was perpetrated by means of torture.[1] There is substantial evidence to support both theories.

A homicide is murder of the first degree when the accused, as the result of deliberation and premeditation, in-

[1] Penal Code, section 189, provides: ''All murder which is perpetrated by means of . . . torture . . . or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree.''

tended to take unlawfully the life of another. (Pen. Code, § 189; *People* v. *Bender*, 27 Cal.2d 164, 178 [163 P.2d 8].)

■ There is ample evidence of deliberation and premeditation here. Defendant had long had difficulties with his wife. He announced that some day he would "do something bad" to her. On the night before the homicide he threatened her with a deadly weapon. On the day of the killing he remained home from work brooding over his troubles. His acts following his discovery that his wife had signed a complaint against him show a fixed intent to kill her. His picking up the empty can, maneuvering to prevent his sister-in-law from warning his wife, filling the can with gasoline, proceeding directly to his victim's house, pursuing her despite her frantic efforts to escape, covering her with gasoline, striking a second match after the first failed to ignite, and his failing to aid in rescue attempts and actively hindering those attempts by disconnecting the hose, were all acts of deliberation that the jury could reasonably conclude were done pursuant to a premeditated plan to kill his wife.

■■ The evidence also supports the theory that the murder was perpetrated by means of torture. Murder is so perpetrated when "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity." (*People* v. *Tubby*, 34 Cal.2d 72, 77 [207 P.2d 51]; *People* v. *Bender*, 27 Cal.2d 164, 177 [163 P.2d 8].) In the present case defendant had previously stated that he intended to "do something bad" to his wife. The jury could reasonably conclude that when defendant set about to burn his wife with gasoline, his intention was to inflict cruel suffering as punishment or revenge on his victim.

The principal contention presented by defendant concerns the trial court's rulings on questions asked by defendant on cross-examination.

After the defendant was taken to the hospital for treatment of his burns, a blood sample was taken by the doctor in attendance, Dr. Eckleson, and given a laboratory analysis. The analysis showed that at about 8 p. m., when the sample was taken, the alcohol content of defendant's blood was about 1.9 milligrams per cubic centimeter. Dr. Neal, director of a laboratory in Visalia, who regularly examined intoxicated persons for the sheriff's office and the California Highway

Patrol, testified that the average alcohol destruction in a person is approximately 10 per cent per hour, which would make the alcohol content in defendant's blood at the time of the killing, about 6:30 p. m., approximately 2.3 or 2.35 milligrams per cubic centimeter.

Dr. Eckleson, called as a witness for the defendant, thought that the average person was "drunk" with about 1.5 alcohol content in his blood. On cross-examination he stated that the influence of alcohol on mental and physical faculties differed greatly from one person to another. When asked by the prosecution to apply his theories to the facts of this case, Dr. Eckleson replied that he thought that a person with the alcohol in his blood that defendant had would be able to buy gasoline, pursue another person and drench her with the gasoline, and light the gasoline, but would still be so drunk that he wouldn't "know what he was doing."

In rebuttal the prosecution called Dr. Neal, who had not personally examined defendant or the blood specimen. He testified that a person with 1.9 alcohol content would understand the consequences of his actions and, on cross-examination, that a person with 2.35 alcohol content could tell right from wrong.

Counsel for defendant asked Dr. Neal on cross-examination if the mind of a person with a 2.35 alcohol content could "function normally." The court, in the presence of the jury, discussed the problem at some length and refused to allow the question to be asked.[2] After the jury was excused,

---

[2]"Haden [counsel for defendant]: And at 2.3 or 2.35, Doctor, his mental ability would be considerably impaired, I take it?

"Dr. Neal: His mental ability would be further impaired, but it is my opinion that his judgment would not be so impaired that he could not tell right from wrong.

"Haden: That isn't the proposition here, Doctor. This isn't a matter of sanity. This is a matter of whether or not his mind could function normally. Do you feel his mind could function normally?

"The Court: That isn't the question. That is misstating the proposition. The question is whether his mind would be so affected by the alcohol that he couldn't form the intent to commit the act. If the——the jury will have to determine whether or not because of the alcohol he is alleged to have consumed he would be incapable to form the intent to commit torture. That is one thing. And also whether he would be able to premeditate, to commit the murder with premeditation. And the question is not whether he was sane or insane, not whether his mind functioned properly, but whether his mind under those conditions was such that he could form the intent to commit either of those two acts.

"Haden: Your Honor, I wonder if you would ask that the jury be excused, please."

the issue was argued by counsel. The court again refused to allow the question and stated that the inquiry must be directed to defendant's ability to form an intent to commit torture or murder. Counsel for defendant did not show any inclination to pursue the issue of sanity and refused to follow the line of questioning indicated by the court. The witness was excused.

 The court's ruling presents the question whether counsel should have been allowed to ask if defendant's mind "functioned normally." In *People* v. *Wells*, 33 Cal.2d 330, 350 [202 P.2d 53], a majority of this court stated: "It thus appears that on the trial in its first stage, mental capacity to commit the crime, insofar as sanity, but sanity only, is concerned, is conclusively presumed but that the specific mental state (intent or motive) necessary to be proved as a fact in order to establish guilt of the particular crime is not presumed, either conclusively or otherwise. Whenever a particular mental state, such as a specific intent, is by statute made an essential element of a crime, that specific state must be proved like any other fact." (Accord, *People* v. *Letourneau*, 34 Cal.2d 478, 487 [211 P.2d 865]; *People* v. *Danielly*, 33 Cal.2d 362, 379 [202 P.2d 18].) It is contended that under the views expressed in the foregoing cases the court's ruling was erroneous. We have reviewed this contention with care because given defendant's admission that he committed the homicide, his only defense of any substance is that he did not have the capacity, by reason of intoxication or otherwise, to form the intent necessary for first degree murder. The disallowed question was not directed to this defense. Dr. Neal testified as an expert on the effect of alcohol on a person's mental and physical capacities. The question whether a person with a 2.35 alcohol content could "function normally" was directed only to the effect of intoxication in the obvious hope that the witness would answer in the negative. But a negative answer, favorable to the accused, would not be directed to the issues of the trial. The question before the jury was whether defendant had the capacity to form the specific intent essential to first degree murder. A person with the alcohol in his blood defendant had, will not ordinarily "function normally" but it does not follow that he could not commit first degree murder. As defense counsel undoubtedly realized, the jury would not necessarily take this distinction into consideration. Faced with a hostile witness, counsel under-

standably wished to protect his client's interests by asking his questions in a general rather than a specific manner. The vice of the question is that it was designed to elucidate an answer that could be misinterpreted by the jury.

This case is not one in which the trial court foreclosed inquiry into the mental condition of the defendant. The court at all times expressed willingness to allow counsel to pursue the matter further if he would rephrase his question. Under these circumstances its refusal to allow the question as presented by counsel was not error.

Defendant points out that in ruling that the question must be rephrased, the court limited the inquiry to defendant's capacity to form the specific intent essential to first degree murder. He then contends that the suggested line of approach was improper, on the theory that an expert witness could not express an opinion on the state of defendant's mind. ■ Defendant's argument is based on the erroneous assumption that an expert cannot be asked a question that coincides with the ultimate issue in the case. (*People v. Wilson,* 25 Cal.2d 341, 349 [153 P.2d 720]; *State v. Romo,* 66 Ariz. 174, 184 [185 P.2d 757]; 7 Wigmore, Evidence [3d ed.], § 1921; see cases collected in 78 A.L.R. 755; 20 Am.Jur., 653.) ■ Counsel could properly have asked Dr. Neal whether a man whose blood had a 2.35 alcohol content could understand that the actions he contemplated would culminate in the wrongful death of another human being.

Defendant also attacks the ruling of the trial court on the ground that the discussion in the presence of the jury was prejudicial. At the request of defendant's counsel the jury was instructed to disregard the statements of the court, and he assured the court that the admonition cured any error. ■ In any event, since a trial court has the duty to instruct the jury on questions of law at the end of the case, it can call counsel's attention to a rule of law in the presence of the jury, when the rule is not being followed. (*People. v. Vukich,* 201 Cal. 290, 298 [257 P. 46].) ■ "The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered. It is not only the right but the duty of a trial judge to so supervise and regulate the course of a trial that the truth shall be revealed in so far as it may be, within the established rules of evidence." (*People v. Mendez,* 193 Cal. 39, 46 [223 P. 65]; *People v. Ottey,* 5 Cal.2d 714,

721 [56 P.2d 193]; 3 Wigmore, Evidence [3d ed.], § 784.)

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.