[Crim. No. 6112.    In Bank.    Jan. 7, 1958.]

THE PEOPLE, Respondent, v. LOIS BROWN, Appellant.

Gladys Towles Root for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Vern B. Thomas, District Attorney (Santa Barbara), Frank J. McCarthy, Assistant District Attorney, and Thomas P. Weldon, Deputy District Attorney, for Respondent.

SCHAUER, J.—A jury found defendant guilty of second degree murder of Lucy Sanchez (count 1) and abortion committed upon Lucy Sanchez (count 2) and upon Clara Thornton (count 3). Defendant appeals from the ensuing judgment of conviction. We have concluded that the judgment should be affirmed as to counts 1 and 3 but that as to count 2 the judgment should be reversed, not because there was any prejudicial error in the proceedings which led to the verdict of guilty on that count but because to permit convictions under both count 1 and count 2 to stand would violate the provision of section 654 of the Penal Code that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . ."

The abortion of Clara was committed on January 18, 1956, and the abortion and murder of Lucy were committed on January 26, 1956. Clara and Lucy resided together in Santa Maria. On January 18, 1956, Lucy had been pregnant for six months and Clara for three months. Clara testified as follows:

On January 18, Clara first met defendant Lois Brown, who said her name was Vi. Lucy had received a telephone call, and she and Clara met defendant on the street and got in defendant's car. Defendant "asked me how far along I was and I told her . . . That I was three months along. . . . She said I didn't have anything to worry about. . . . Lois said that Lucy was a little bit further ahead of me and it was a little more dangerous for her to go through with it, but said she would be all right, if Lucy would be in the care of Vi and present to tie the baby's navel cord and watch her from hemorrhaging." Lucy got out of the car and went back home and defendant and Clara went to 2650 South Broadway. At defendant's request Clara gave her $100. Defendant inserted a syringe in Clara's genitals and injected a solution which looked and smelled like Lifebuoy soap. At this time Clara was in good health. Defendant "said that she was in need of the money and she wished she could take us both . . . She said she was doing it to us for $100.00 and she usually did it for $200.00 in Los Angeles."

Defendant and Clara then went to the café where Lucy worked and defendant "told Lucy that I was going to be all right and told her that she would see her later and see if she could get any money to go through with hers."

Clara and Lucy went home, accompanied by Beatrice Duran, a friend. Clara "had kind of a watery discharge." The next morning, she testified, "I started getting bad pains and then I started flowing blood, and then I was in terrible pain . . . and then I went to the bathroom . . . and passed a clot or something after quite a while, and the pain was relieved a little bit then." At about 11 o'clock defendant came to Clara's and Lucy's home. While defendant was present Clara "was still cramping a little bit . . . [and] passed another small clot" which defendant examined "and called Beatrice and Lucy to look at it and told them that was the afterbirth and that I was going to be all right." Defendant "massaged my abdomen and she said for me to do that every once in a while, so everything that was left in there would come out, and then she called Lucy . . . and showed her." Defendant "asked Lucy if she thought she could borrow the money and go through with it, and Lucy said she didn't know, and Lois asked her if she thought Ira [Ira Gin, a witness hereinafter mentioned] would loan her the money. . . . Lucy said she didn't know, so Lois said she would take her so she could go ask him if he would lend her the money." Defendant and Lucy then left.

Beatrice Duran testified that she was at Clara's and Lucy's home on the morning of January 19, 1956; that defendant came to the home, massaged Clara's abdomen, and called attention to a "meaty" substance which defendant said was the afterbirth; that she explained that "she was massaging her stomach so the womb would go back into place"; and that "she told Clara to go to the doctor and tell the doctor she had a cold and to give her a penicillin shot."

Dr. Randall, a physician who examined Clara on January 30, 1956, testified that in his opinion she had been pregnant and had had an induced abortion about 10 days before his examination. Clara described to the doctor the manner in which the abortion had been performed, by the injection of a solution with a syringe; the doctor's findings from his examination "fit in with the history that was given us on the case."

According to further testimony of Clara, defendant came to the home of Lucy and Clara at about 3:30 p. m. on January 26 and left with Lucy. Lucy was wearing clothes, identified by Clara, which were subsequently found at 2650 South Broadway. When Lucy left the house she was in good health. Shortly prior to January 26 Clara had repaid Lucy $100

which Lucy had loaned her. At about 7:30 p. m. on January 26 defendant came to the café where Clara worked. "She asked me if I could go with her and see Lucy and if she could take her over to our house . . . and if I thought anybody would bother them over there, and that they had gotten through about 5:00 o'clock and that she started flowing pretty heavily at the time and she started getting dizzy, then went out into a coma . . ., and she was moaning pretty bad and she was afraid that somebody in the neighborhood would hear her and that she'd stay over at our house with her overnight and take care of her." Defendant and Clara went to 2650 South Broadway. Defendant's mother was present. Lucy was lying on a couch with her raincoat and newspapers underneath her and a blanket and bedspread covering her. There was blood on the bedspread, the newspapers and raincoat, and on Lucy's legs and body. Defendant appeared nervous and excited. Defendant and Clara carried Lucy to the car which defendant had and, with defendant's mother, drove to a hospital. Defendant told Clara that "if they asked me where we had gotten Lucy, to tell them that we had gotten her from our house, and that I had called her [defendant] up for help."

As defendant, her mother, and Clara waited outside the emergency room, according to Clara's further testimony, defendant "said she knew she shouldn't have done it, and . . . took out her wallet, took out $30.00 and gave it to me and she said that those $30.00 were to help me in case Lucy needed anything."

A doctor then informed Clara, defendant, and defendant's mother that Lucy was dead on arrival at the hospital. As Clara, defendant, and defendant's mother waited, defendant "said that she didn't know what to do—whether to tell the truth or to deny it . . . [Defendant] asked me what she should do—whether she should run away or stick it out . . . and then she took out her wallet again from her purse and told me—'Here's the rest of Lucy's money so that you can use it for her funeral.'" Defendant then gave Clara $70.

A physician who performed an autopsy upon the body of Lucy testified that in his opinion she died of acute loss of blood from the large blood channels within the uterus; the forcible separation of the membranes "was caused, in my opinion, by some blunt object which produced dilatation of the cervix"; the membranes of the uterus were of a dark brown color and granular appearance which could have been due to the introduction of chemicals by external means.

Ira Gin testified that about two months before January 26, 1956 (the date of Lucy's death), Lucy told him that she was pregnant and that "She was going to Tia Juana and get an abortion." Thereafter Clara "told me she was pregnant."

Gin further testified that in November or December, 1956, defendant went with Gin to the café where Lucy worked and the following conversation occurred: "I introduced Lucy Sanchez to Lois Brown. I said, 'This is the lady you want to see.' . . . [Defendant] said—'I know a lady who can help you.' . . . [T]hey make appointment, meet in front of the post office, 6:00 the next day." Thereafter defendant again went with Gin to the café and met Lucy. "Lois said, 'You have the money—I can help you,' and Lucy gave Lois the phone number of where she lived." Lucy and defendant said that they would meet the next day.

About five days before Lucy's death Lucy and defendant came to Gin's room. Lucy asked to borrow some money from Gin. Gin refused but told defendant, "Lucy's honest, you can trust her."

Lucy's sister testified that Lucy told her, three or four months before her death, that she was pregnant and was going to have an abortion.

As appears from the foregoing summary of salient portions of the testimony, there was sufficient evidence to support the verdicts. Evidence introduced by defendant in contradiction and attempted explanation of the evidence which supports the verdicts need not be summarized.

Defendant contends as to count 3 (abortion of Clara) that Clara's testimony was not corroborated as required by section 1108 of the Penal Code.[1] ■ It is fundamental that the corroboration of the testimony of an accomplice *must* tend to connect the defendant with the commission of the offense. "The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth. [Citations.] . . . ■ [C]orroboration is not adequate if it requires aid from the testimony of the person to be corroborated in order to connect the defendant with the commission of the offense charged." (*People* v. *MacEwing* (1955), 45 Cal.2d 218, 223

---

[1]Pen. Code, § 1108: "Upon a trial for procuring . . . an abortion . . ., the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence."

[2], 224 [3], 225 [7] [288 P.2d 257].) ■ The testimony of Beatrice Duran as to events on the day following Clara's abortion meets these tests. It tends to connect defendant with the crime of abortion committed on Clara without aid from the testimony of Clara, and it could and presumably did satisfy the jury that Clara was telling the truth.

■ The People rely also upon the testimony of Dr. Randall, who treated Clara on January 30, 1956, as corroboration. The doctor's testimony does not meet the test of connecting defendant with the abortion which Clara underwent. *People* v. *Ramsey* (1948), 83 Cal.App.2d 707, 713, 717 [4] [189 P.2d 802], is inconsistent with *People* v. *MacEwing* (1955), *supra*, 45 Cal.2d 218, 225 [7], insofar as it suggests that testimony which does not itself connect the defendant with the criminal abortion is sufficient corroboration; in this respect the Ramsey case does not represent the law and, to avoid possible confusion, is to that extent disapproved.

■ Beatrice Duran testified that on January 19, 1956, defendant came to the home of Clara and Lucy at about 11:00 a. m. and left at about 12:30 p. m., when she drove the witness to her place of work. An attorney whom defendant consulted on a business matter testified that on January 19, 1956, he saw defendant in his office "shortly before noon" and she returned "between 1:30 and 2:00 o'clock." Defendant asserts that "It is certainly more probable that an attorney at law would be speaking the truth than Mrs. Duran, Clara's girl friend." Both Mrs. Duran and the attorney purported to give only approximations of the times to which they testified, and there is no indication that either of them was falsifying. It was for the jury to determine the relative accuracy or weight of their respective estimates of time and the truth of the balance of Mrs. Duran's testimony. Defendant herself, although she denied the incriminating portions of Mrs. Duran's testimony, testified that she visited the home of Clara and Lucy at about noon on January 19, 1956, and that she drove Mrs. Duran to work at about 1:00 or 1:30.

As previously stated, Dr. Randall, who examined Clara on January 30, 1956, testified that from his examination of Clara and her case history he formed the opinion that she had undergone an induced abortion. In answer to the question, "Now what were the reasons for your opinion . . . that an abortion was performed and that it was induced?" the doctor testified, "the patient gave me a history of having had . . . the first day of her last normal menstrual period September

the 9th, 1955. Following that period she had . . . no more bleeding of any type until the time on the 18th day of January when she found a person that had offered to do an abortion on her to relieve her of her pregnancy.

"The history was that the individual went to a residence south of the City, and the other person involved went there to perform the abortion on her."

Defendant's counsel moved to strike from the doctor's testimony as to the history the portion "beginning with 'that she went to a certain person for an abortion' and then on through where she went et cetera." The court denied the motion but admonished the jury that "any history that has been given to the doctor by the patient . . . is not to prove the truth of those statements. In other words, to whom she went, or where she went,—you are not permitted to take those into consideration as proving the truth of those particular matters to which he testifies, but only to be used as a basis for the doctor's opinion." The doctor then testified to Clara's account of the manner in which the abortion was performed.

Defendant urges that the above quoted testimony which she moved to strike, as well as the doctor's testimony as to Clara's description of the abortion procedure, was inadmissible. It cannot be doubted that a physician's diagnosis as to an injury will usually be based (as Dr. Randall testified that a medical diagnosis is based) in part upon the history given by the patient. ▉ And the physician should be allowed to testify to all the facts upon which he based his opinion, including the case history given him by the patient as well as facts learned by immediate personal observation. Therefore, declarations to a physician concerning physical condition prior to an accident (*Groat* v. *Walkup Drayage etc. Co.* (1936), 14 Cal.App.2d 350, 357 [8] [58 P.2d 200]) and declarations as to the history of an accident (*Tierney* v. *Charles Nelson Co.* (1937), 19 Cal.App.2d 34, 37 [2] [64 P.2d 1150]) have been admitted as a basis for the opinion of a physician to whom the declarations were made. In the following cases also declarations to a physician were held admissible not to show the truth of the facts stated but as the basis of his opinion: *People* v. *Shattuck* (1895), 109 Cal. 673, 678-679 [42 P. 315] ["statements as to past suffering and condition"]; *Willoughby* v. *Zylstra* (1935), 5 Cal.App.2d 297, 300 [2] [42 P.2d 685] [declarations "of previous condition and past suffering"]; *Rohner* v. *Cross* (1932), 121 Cal.App. 667, 669 [2] [9 P.2d 509] ["some of the history of Mrs.

Rohner's case"] ; *Davis* v. *Renton* (1931), 113 Cal.App. 561, 564 [4] [298 P. 834] [statement that plaintiff was unconscious as a result of her injuries] ; *People* v. *Hickok* (1921), 56 Cal. App. 13, 17 [1] [204 P. 555] ["history of the case"] ; see also *People* v. *Wilson* (1944), 25 Cal.2d 341, 347-348 [12] [153 P.2d 720] [the following opinion evidence held proper: "Q. From your examination of this . . . patient . . . and from the case history that you took, did you form an opinion as to whether her abortion was spontaneous or induced? A. It was my opinion that the abortion was induced"] ; VI Wigmore, Evidence (3d ed., 1940), § 1720 (1). The foregoing cases in which extrajudicial declarations were admitted do not purport to announce an exception to the hearsay rule;[2] that is, they hold that the statements are admissible not as proof of the facts stated but to enable the expert to explain and the jury to appraise the basis of his opinion. *Jenkin* v. *Pacific etc. Ins. Co.* (1900), 131 Cal. 121, 122-123 [63 P. 180], cannot be taken as authority contrary to the foregoing cases; it announces without explanation or discussion that statements of a deceased to a physician as to how he came to be injured were properly stricken. Nor is *Estate of James* (1899), 124 Cal. 653, 662 [57 P. 578, 1008], contrary to the foregoing cases. In the James case it is held that testimony of physicians as to the physical condition of a declarant based solely upon his declarations as to such condition is inadmissible.

In *Losleben* v. *California State L. Ins. Co.* (1932), 119 Cal. App. 556, 559-560 [2] [6 P.2d 1012], it is held that objections were properly sustained "to questions attempting to bring out what the patient stated to the physician in relation to what had caused the existing condition." It is said that "It does not appear that these statements were necessary to enable the physician to determine the condition of the insured [patient], and it does appear that the nature of his trouble was determined by the physician from his objective examination of the patient." It is further said, quoting from 22 Corpus Juris, page 268, that "Narrative statements to a physician are to be rejected *where they relate to facts not connected with diagnosis and treatment,* such as the cause of an illness or injury, the circumstances under which an injury

---

[2]*Cf.* VI Wigmore, Evidence (3d ed., 1940), § 1722 (c): Some jurisdictions recognize an exception to the hearsay rule in the case of declarations to a physician as to "past sufferings and symptoms"; the exception "does not include the past *external events* attending the injury or illness."

was received, or the instrument with which it was inflicted, or past sufferings of the patient.'' (Italics added.) ▮ Such narrative statements are admissible in this state as a part of the foundation on which the doctor relied where they relate to facts connected with diagnosis and treatment, as, here, Clara's description of the cause and circumstances of her injury and the instrument with which it was inflicted.

▮ Dr. Randall's testimony that Clara stated that she ''went to a residence south of the City'' should have been stricken since it was not as to a declaration upon which he based his opinion as to her condition. However, it does not appear that the admission in evidence of that declaration prejudiced defendant, in view of Clara's testimony to the same effect.

Defendant complains that Dr. Randall testified to an ultimate fact in issue, that is, that Clara had undergone an induced abortion. ▮ It is now well settled that there is in this state no absolute rule that an expert cannot testify to an ultimate issue of fact. (*People* v. *Johnston* (1957), 48 Cal.2d 78, 90-91 [307 P.2d 921] ; *People* v. *Cole* (1956), 47 Cal. 2d 99, 105 [3] [301 P.2d 854] ; *People* v. *Martinez* (1952), 38 Cal.2d 556, 564 [6] [241 P.2d 224] ; *People* v. *Wilson* (1944), 25 Cal.2d 341, 349 [15] [153 P.2d 720].) Here, as in the Wilson case, the physician could give the jury the benefit of his expert knowledge relative to this pertinent event only by testifying to such ultimate fact.

Defendant complains of the admission in evidence of a syringe which was expressly offered and received solely for the purpose of illustration. Clara testified that the instrument was similar to the one used by defendant but on examination by defendant's counsel she testified to a number of particulars in which it differed from the instrument used by defendant. ▮ Objects similar to those connected with the commission of a crime can properly be introduced in evidence for the purpose of illustration. (*People* v. *Miner* (1950), 96 Cal.App.2d 43, 51 [5] [214 P.2d 557] ; see Fricke, Criminal Evidence (4th ed., 1957), pp. 149-150.) While we do not commend the practice of introducing in evidence as illustration an object which is not substantially identical with the object to be illustrated, it does not appear that the use of the syringe as illustrative evidence could have prejudiced defendant.

▮ Defendant complains that the trial court erred to her prejudice in receiving the testimony of Ira Gin that about

two months before Lucy's death she told him that she was pregnant and that "She was going to Tia Juana and get an abortion." Defendant, citing *People* v. *Wright* (1914), 167 Cal. 1, 8 [138 P. 349], and *People* v. *Thomas* (1921), 51 Cal. App. 731, 735 [1] [197 P. 677] (accord, *People* v. *Northcott* (1920), 45 Cal.App. 706, 712 [4] [189 P. 704]; *cf. Thrasher* v. *Board of Medical Examiners* (1919), 44 Cal.App. 26, 28 [185 P. 1006]), concedes that declarations of a woman upon whom an abortion was assertedly performed that she was pregnant and that she intended to visit the defendant in order to have an abortion are admissible as evidence of her condition and purpose. But here, defendant argues, the statement concerning Lucy's intent was made at a time so remote from her alleged abortion and murder that it was inadmissible. The circumstance that the statement to which Gin testified was made two months before the alleged crimes against Lucy goes only to its weight, and the statement was properly received. Such statement could well have been given additional incriminatory weight in the light of a statement by defendant to the investigating authorities, on the day after Lucy's death, that Lucy about three months theretofore, had told defendant that she was pregnant; that she asked defendant if she "knew someone that could help her . . . In her condition"; that defendant "told her I didn't know, but I would try and find out"; that about a month before Lucy's death defendant told Lucy "that it might be possible for her to go to Tijuana"; that defendant had inquired in Tijuana "as to who could do that"; and that Lucy had told defendant "that she would pay a hundred dollars." The jury might also have given additional incriminatory weight to Gin's testimony concerning her condition and purpose in the light of defendant's testimony that she had told Lucy "That I might try and find out for her. . . . About going to Tijuana. . . . About being able to find out the information for her friend, to be done down there. . . . She said her friend was in a family way and she wanted to help her"; that on November 27 she went to Tijuana and inquired of a peddler concerning a doctor "that would help a woman in the family way"; and that thereafter Lucy asked defendant if defendant could take her to Tijuana and defendant said that she could not.

▐ Defendant argues at some length, by quotation from medical textbooks, against the correctness of the autopsy surgeon's conclusion that Lucy's abortion was induced. This argument is not based upon evidence which was before the

jury. Furthermore, even if there were competent evidence of opinion contrary to that of the autopsy surgeon, defendant's argument would go only to the weight of the evidence and therefore would be inappropriate before an appellate court.

As previously indicated, a statement of defendant made to the investigating authorities on the day after Lucy's death was read to the jury. This statement had been reported by a shorthand reporter and was also recorded. When the prosecution offered the statement in evidence by testimony of the reporter from his transcription of his notes, defense counsel, out of the presence of the jury, asked that instead the record be played because "that is the first or original testimony and . . . anything else would be secondary." The court ruled, "We will have the statement [read] now and then get the recording." Defense counsel stipulated that the statement could be read into evidence "with the further provision that the record may be made available." The record was subsequently played to defense counsel out of the presence of the jury.

Thereafter defendant testified that while Deputy District Attorney Weldon was obtaining the statement, "he would ask me three or four questions at a time, sort of shouting and yelling at me without letting me answer at least one of them before he got all the other ones in," and that this conduct persisted throughout defendant's questioning. On rebuttal the People asked to play the recording to show the manner in which defendant's statement was taken by Mr. Weldon. Defense counsel objected that it would be erroneous and unfair to introduce a repetition of defendant's statement by playing the record. After argument before the jury the court sustained the objection, stating that to play the record would be to place the same evidence before the jury twice.

In argument counsel for the prosecution referred to defendant's testimony that during the taking of the statement Mr. Weldon shouted, "asked two or three questions at the same time, and didn't give her a chance to answer, and that that course of conduct persisted throughout her entire questioning." The prosecuting attorney argued, "The Court would not permit the actual voices of Mr. Weldon and Mrs. Brown to be played before you, but the denial of that permission was raised by an objection which the defendant made. The defendant herself made that objection and his Honor passed on it as a legal matter, and I cannot comment any more on that, except to say that, in my opinion, that that

record would have established one way or the other. We regret that you were not permitted to hear it."

Defense counsel assigned this argument as prejudicial error. The prosecuting attorney replied, "I have mentioned the fact which the jury heard, that there was an objection made and a ruling by the Court by reason of which that was not permitted to be played. I do not think that is improper." The trial judge agreed with the prosecution and ruled, "It is an inference which the jury may draw if they see fit to do so."

The prosecutor's argument and the judge's ruling improperly encouraged and permitted the jury to speculate that the defendant objected to the admission in evidence of the recording of the statement because it would refute her testimony as to the manner in which Mr. Weldon questioned defendant. It is the law, and the jury were instructed, that "At times throughout the trial the court has been called upon to pass on the question whether or not certain offered evidence might properly be admitted. You are not to be concerned with the reasons for such rulings and are not to draw any inferences from them. Whether offered evidence is admissible is purely a question of law." While it does not appear that the giving of the quoted instruction could have counteracted the effect of the specific ruling that "It is an inference which the jury may draw if they see fit to do so," it further does not appear that such erroneous ruling resulted in a miscarriage of justice. Although in a close case such error could well require a new trial, from a review of the entire record here it is clear that the case was not a close one, and it does not appear that the reason for the exclusion of the recording from evidence could have been a determinative factor in the jury's conclusion.

Defendant contends that the two convictions for crimes against Lucy, murder and abortion, cannot stand because of the provision of section 654 of the Penal Code that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either bars a prosecution for the same act or omission under any other. . . ." It is manifest from the evidence that defendant committed against Lucy only one criminal act, that is, the insertion of a blunt instrument in combination with the injection of a solution. That act, be-

cause it was "with intent thereby to procure the miscarriage of such person" and was not "necessary to preserve her life," violated section 274 of the Penal Code. The same act, because it resulted in "the unlawful killing of a human being, with malice aforethought" (Pen. Code, § 187), violated the proscription of section 189 of the Penal Code against murder of the second degree.[3] Section 654 has been applied not only where there was but one "act" in the ordinary sense (*People* v. *Kynette* (1940), 15 Cal.2d 731, 761 [30] [104 P.2d 794] [single act of placing a bomb in an automobile constituted attempted murder, assault with intent to commit murder, and malicious use of explosives[4]]), but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654. Where the question is whether a transaction is divisible or indivisible, each case must be resolved on its facts. (See *People* v. *Greer* (1947), 30 Cal.2d 589, 604 [184 P.2d 512] [statutory rape and lewd and lascivious conduct; "Except for the rape itself, the only act of which . . . [the prosecuting witness] accused defendant was the forcible removal of her underclothing immediately preceding the rape. To hold that the removal of the prosecutrix's underclothing constitutes an act separate from the rape . . . would be artificial in the present context and would permit double punishment . . ."]; *People* v. *Kehoe* (1949), 33 Cal.2d 711, 715 [304 P.2d 321] [grand theft of an automobile and driving or taking without permission on the same day in the same county; "in the absence of any evidence showing a substantial break between Kehoe's taking and his use of the automobile . . ., only the conviction for one offense may be sustained"]; *People* v. *Knowles* (1950), 35 Cal.2d 175, 187, 188 [217 P.2d

---

[3]Homicide resulting from criminal abortion is murder of the second degree. (*People* v. *Powell* (1949), 34 Cal.2d 196, 205 [7] [208 P.2d 974]; *People* v. *Wright* (1914), *supra*, 167 Cal. 1, 5.) Malice may be inferred from the deliberate commission of an unlawful act amounting to felony. (*People* v. *Olsen* (1889), 80 Cal. 122, 126-127 [22 P. 125]; *People* v. *Bauman* (1940), 39 Cal.App.2d 587, 591 [4] [103 P.2d 1020]; *People* v. *Wallace* (1934), 2 Cal.App.2d 238, 240 [1] [37 P.2d 1053].)

[4]It may be noted that malicious use of explosives was made punishable not by "this code" (i.e., the Penal Code) but by the Health and Safety Code. Penal provisions are not confined to the Penal Code, and the court in the Kynette case properly assumed that the reference to "this code" in section 654 was not intended to exclude penal provisions found in other statutes.

1] [robbery and kidnaping as defined by section 209 of the Penal Code as amended in 1933 to include holding or detention to commit robbery; "If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been committed so that more than one statute has been violated. If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed, notwithstanding that the offenses are not necessarily included offenses. . . . Defendant committed no act of seizure or confinement other than that necessarily incident to the robbery"]; *People* v. *Logan* (1953), 41 Cal. 2d 279, 290 [11] [260 P.2d 20] [first degree robbery by person armed with baseball bat and assault with deadly weapon; "The one act of inflicting force with the bat cannot both be punished as assault with a deadly weapon and availed of by the People as the force necessary to constitute the crime of robbery"]; cf. *In re Chapman* (1954), 43 Cal.2d 385, 389 [3] [273 P.2d 817] ["petitioner perpetrated the robbery while armed with a deadly weapon with which he menaced the victim and obtained from him a sum of money through thus placing him in fear; after the victim had laid the money down, he started to run away, Larios tackled him and petitioner then struck him with the weapon. . . . [T]he pursuit of the victim and the striking of him with the weapon constituted a separate crime of assault with intent to commit great bodily harm"].)

Contrary to the approach of the foregoing cases is *People* v. *Coltrin* (1936), 5 Cal.2d 649, 660-661 [55 P.2d 1161], which holds that in the case of murder in the commission of an unlawful abortion the two offenses can both be punished. (See also *People* v. *Powell* (1949), *supra*, 34 Cal.2d 196; *People* v. *Gomez* (1940), 41 Cal.App.2d 249 [106 P.2d 214], where convictions of abortion and of homicide resulting from the abortion were affirmed, but the question of double punishment for one act was not considered.) The discussion of section 654 in the Coltrin case is intermingled with discussion of double jeopardy; the court apparently overlooked the rule that no plea of double jeopardy can properly be made where the defendant is tried but once. (*People* v. *Amick* (1942), 20 Cal.2d 247, 251 [125 P.2d 25]; *People* v. *Day* (1926), 199 Cal.

78, 83 [248 P. 250] ; *People* v. *Horowitz* (1933), 131 Cal.App. Supp. 791, 793 [1] [19 P.2d 874].)

Specifically concerning section 654 it is said in the Coltrin case (p. 660 [13] of 5 Cal.2d), "If the act involved in one charge is necessarily involved in the other and is merely incidental to that charge but one offense is committed and it cannot be carved into two offenses in order to inflict a double punishment." It does not appear accurate to say that "but one offense is committed" in the circumstances. Rather, section 654 comes into application where a defendant by one act commits more than one offense.

It is further said in the Coltrin case (p. 661 [14] of 5 Cal. 2d), "The act of committing an abortion and the act of killing a person while attempting to do this are not merely the same act made punishable in different ways. Not only are these two offenses separate and distinct in a legal sense and each dependent upon evidence not required in the other, but as a practical matter it cannot be said that the two charges involve but one act. The act of committing an abortion may be done without causing the death of the party operated upon. The act which causes the death of the same person is usually another act, careless or otherwise, which, while it may be committed in connection with the first and about the same time, involves a further and additional element." It is artificial to say that the act which caused death in the Coltrin case, and the act which caused death in the present case, was another act than that which constituted the abortion. Furthermore, under section 654, the Coltrin case is mistaken in its dictum (p. 660 [11] of 5 Cal.2d) that "where a defendant was convicted on an abortion charge and where the victim thereafter died, the first conviction would not be a bar to a subsequent prosecution for murder." Insofar as the Coltrin case is contrary to section 654 of the Penal Code and to the many cases which, obediently thereto, hold that a person cannot be twice punished for one act, it is overruled.

To preclude the possibility of the dual judgments prejudicing defendant in the fixing of her term by the Adult Authority, the judgment of conviction of the less severely punishable offense should be reversed. (See *People* v. *Roberts* (1953), 40 Cal.2d 483, 491 [16] [254 P.2d 501] ; *People* v. *Knowles* (1950), *supra*, 35 Cal.2d 175, 189 ; *People* v. *Kehoe* (1949), *supra*, 33 Cal.2d 711, 716.)

For the reasons above stated the judgment as to count 2 is reversed and the judgments as to counts 1 and 3 are affirmed.

Gibson, C. J., Carter, J., Traynor, J., Spence, J., and McComb, J., concurred.

SHENK, J.—I dissent.

The precise question involved in this case was decided contrary to the contentions of the defendant by a unanimous court in *People* v. *Coltrin,* 5 Cal.2d 649 [55 P.2d 1161], and I can see no good reason or justification for overruling it. This court there construed the statute and the decision has been in effect for over 21 years. In the meantime the Legislature has not changed the law to conform to the views of the present majority of the court, which, contrary to the established law, now proceeds to legislate on the subject and thus to make it easier for a lawbreaker to escape the penalties of the law.

It is conceded that the defendant's conduct as to Lucy Sanchez constituted a violation of both section 274 (abortion) and section 187 (murder) of the Penal Code. In the Coltrin case the defendant performed an illegal abortion which resulted in the death of the victim. He was convicted of both abortion and murder in the second degree. In affirming the judgment this court stated beginning at page 661: " 'The act of committing an abortion and the act of killing a person while attempting to do this are not merely the same act made punishable in different ways. Not only are these two offenses separate and distinct in a legal sense and each dependent upon evidence not required in the other, but as a practical matter it cannot be said that the two charges involve but one act. The act of committing an abortion may be done without causing the death of the party operated upon. The act which causes the death of the same person is usually another act, careless or otherwise, which, while it may be committed in connection with the first and about the same time, involves a further and additional element. . . .'

"Certainly murder does not include abortion. Neither is the converse true. Death is by no means a necessary ingredient of abortion. There are classes of crime which have the same basic elements and a conviction or acquittal of one is a bar to a prosecution of the other. Assaults are of this class and a conviction of an assault with a deadly weapon

with intent to commit murder, made upon the same person and consisting of one act, bars a prosecution for an assault with a deadly weapon or assault.''

The court specifically considered section 654 of the Penal Code, relied upon by the court in the present case, as prohibiting punishment for both murder and abortion, and held it inapplicable for the reason that it had ''no relevancy whatever to the proposition before us. It is not sought in this proceeding to punish abortion in any different way than the sole manner provided by section 274 of the Penal Code. . . . Murder and abortion are two distinct crimes and are not the same offenses, and there is no common basis upon which they must rest as the same offense.''

In 1949 this court also affirmed a judgment of conviction of abortion and manslaughter in a case where the offenses arose out of the death of the victim following her abortion. (*People v. Powell*, 34 Cal.2d 196 [208 P.2d 974]; see also *People v. Gomez*, 41 Cal.App.2d 249 [106 P.2d 214].)

I would affirm the judgment in its entirety.