Filed 12/9/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALIFORNIA BANK & TRUST, as Assignee, etc., <br>     Plaintiff and Appellant, <br> v. <br> THOMAS DEL PONTI et al., <br>     Defendants and Respondents; | E053187 <br><br> (Super.Ct.No. CIVSS808384) <br><br> The County of San Bernardino |
| ADVENT, INC., <br>     Plaintiff and Appellant, <br> v. <br> CALFORNIA BANK & TRUST, as Assignee, etc., <br>     Defendant, Cross-complainant and Appellant; <br><br> THOMAS DEL PONTI et al., <br>     Cross-defendants and Respondents | (Super. Ct. No. CIVSS811307) <br><br> The County of San Bernardino <br><br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County. Frank Gafkowski, Judge. Affirmed.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II.1.A, II.1.B, II.1.C, II.1.D, II.1.F, II.2, and III.

1

Troutman Sanders, Dan E. Chambers, Amy A. Hoff and Thomas H. Prouty for Plaintiff and Appellant.

Law Offices of Michael J. Buley, Michael J. Buley and Ursula McDonnell for Defendant and Respondent David Wood.

Edward M Picozzi and Treg A. Julander for Plaintiff, Respondent and Cross-Appellant Advent, Inc.

Five Corners Rialto, LLC (Five Corners), obtained a construction loan from Vineyard Bank (Bank) to develop a 70-unit townhome project (Project), with guaranties from Thomas DelPonti and David Wood, principals of Five Corners (Guarantors).  Five Corners contracted with Advent, Inc. (Advent), a general contractor, to build the project in two phases.  Everything went according to schedule for the first 18 months.  However, when Phase I of the Project was nearly complete, the Bank stopped funding approved payment applications, preventing completion and sale of the Phase I units, which, in turn, caused Five Corners to default on the loan.

The Bank reached an agreement with Five Corners, requiring Advent to finish Phase I so the units could be sold at auction, and promising to pay the subcontractors if they discounted their bills and released any liens.  Advent paid the subcontractors out of its own pocket in order to keep the project lien-free, so the auction could proceed.  However, the Bank foreclosed against Five Corners.  Advent filed an unbonded stop notice.  The Bank (through its assignee California Bank and Trust), sued Five Corners and the Guarantors under various theories for the deficiency following a Trustee's Sale of

the Deed of Trust, while Advent sued the developer and the Bank for restitution for the amounts it paid out of pocket.

The cases were consolidated and tried by the court.[1] Advent amended its complaint to conform to proof to add causes of action for breach of the assigned contract and promissory estoppel. The court awarded judgment in favor of Advent on these causes of action. The court denied Advent judgment for enforcement of its stop notice claim. In the Bank's action against the Guarantors, the court found that the Bank breached the loan contract, exonerating the Guarantors. The court awarded attorneys' fees to Advent and the Guarantors.

The Bank appealed the judgments, challenging the order allowing Advent to amend its complaint to conform to proof, asserting that the trial court engaged in misconduct, and challenging the sufficiency of the evidence to support the judgment in favor of Advent and the Guarantors. Advent appealed the portion of the judgment denying enforcement of the stop notice. We affirm.

I.

**BACKGROUND**

In 2006, Andrew Wood and his brother David Wood formed a single purpose partnership with Stratus Residential Properties (Stratus), a real estate development company, which, in partnership with Phoenix Realty Group (PRG), and Genesis Workforce Housing Fund (Genesis), a real estate fund, was called Five Corners. Five

---

[1] Prior to trial, a default judgment was entered against Five Corners.

3

Corners was created to develop and construct the Project in Rialto, California. Five Corners was owned by Stratus, which acted as the managing member, and Genesis, which was the equity investor member. Thomas DelPonti and David Wood were the owners and managing members of Stratus. Phoenix Housing Partners, part of PRG was the manager of Genesis. Stratus acquired the property and acted as the managing partner and developer.

On February 6, 2006, Five Corners signed a construction loan agreement with Vineyard Bank, to borrow $22.5 million for the Project. The loan agreement included an assignment of the construction contract. The assignment of the construction contract gave the Bank the authority to step into the shoes of the contractor in order to complete a project if the borrower defaults or in the event of foreclosure. In addition to the construction contract, an Assignment of Building Permit was executed.

On behalf of Five Corners, DelPonti and David Wood executed a promissory note secured by a deed of trust. The promissory note had a maturity date of August 31, 2007, with a provision for a six-month extension to February 29, 2008. DelPonti and David Wood, on behalf of Stratus, also executed commercial guarantees for repayment of the loan.

The loan agreement called for incremental advances of funds, upon approval of monthly payment applications; the loan was not funded until specific draw requests were made by way of payment applications. The balance of the loan would remain undisbursed and available upon submission of proper draw requests, providing the loan

4

was not in default. Under the loan heading "Disbursement of Funds," the agreement provided that the ratio of the amount of the loan to the value of the property as completed shall not exceed 75 percent. The loan agreement also listed several items which constituted an event of default, with a provision requiring 15 days' notice by the Bank to the borrowers to cure any default.

On September 28, 2006, Five Corners entered into a construction contract in the amount of $13,958,031 with Advent, a building contractor, to act as general contractor. Under the construction agreement, Advent would perform all site work improvements and construction of all buildings and common areas of the Project. The Project consisted of 70 units, comprising 40 buildings plus one recreation room and was to be completed in two phases: Phase I entailed the completion of five models and 30 townhomes, which were to have been sold to pay the loan upon maturity and to fund the construction of the remaining 35 townhomes.

Each month, Advent submitted payment applications to Five Corners on behalf of subcontractors based on a percentage of completion. The percentage of completion was determined according to a schedule of values which was appended to the construction contract. After inspection, Five Corners would sign off on the payment application, which was then forwarded to the Bank. The Bank conducted its own inspection, and if it was satisfied with the percentage of completion, it would approve the payment application and transfer funds to Fund Control for disbursement to Advent. The payment applications were numbered sequentially. The Bank was obligated to provide the

5

incremental funding upon receipt of the approvals if the borrower was not in default. Normally, if the Bank decided not to approve a fund request, the contractor or developer would be informed of the disagreement.

All went well for the first 18 months of the Project; Advent commenced construction and received the first 16 payments pursuant to their sequentially numbered applications in a timely fashion. But by the end of 2007, and through early 2008, the Bank withheld payments for the applications numbered 17 through 22, although the Bank did eventually make partial payment on Application No. 19. Application No. 17, in the amount of $281,906.75, was dated October 30, 2007. Application No. 18, in the amount of $313,337.12, was submitted on November 15, 2007. Application No. 20 was submitted on February 10, 2008, in the amount of $311,162.75. Application No. 21, covering the period through March 15, 2008 was submitted in the amount of $85,300.60. These four payment applications were never paid, although they had been approved by Five Corners. Bank records showed it had neither denied nor approved the unpaid applications. No notice of default had been issued on the loan at the time the payment applications were submitted.

When Five Corners inquired about the nonpayments, the Bank repeatedly responded that it was working on it. Because Draw No. 19 had been paid, sandwiched between other unpaid payment applications, Five Corners and Advent believed the other draws would eventually be paid, as well. According to the Bank, the payment of

6

$341,613 on February 19, 2008 signified that the loan was active on that date. The Bank never informed the borrowers that the loan was in default.

The Bank contended that an appraisal of the property in August or September 2007 revealed that the loan-to-value ratio exceeded 75 percent, which, in the opinion of Sean Johnson, the Bank's Asset Manager, constituted an event of default. The Bank sent an e-mail to the Guarantors, but never informed the borrower or the Guarantors that the loan was considered to be in default, and did not request that the loan be brought into balance. The Bank's e-mail did not mention the change in loan-to-value ratio, or inform the borrowers that it would be treated as a default. Instead, the e-mail simply informed the borrowers that with the declining values in the market, there would not be any room for additional advances, and that a capital call might be required.

The change in loan-to-value ratio was attributed to changes in the real estate market in the Inland Empire at that time. Five Corners's principals met with the Bank to discuss budget, timing, sales, and marketing of the units. But the borrowers did not recall the Bank mentioning the loan-to-value ratio. Despite the change in loan-to-value ratio, the Bank agreed to extend the loan's maturity date to February 2008, and did not request a capital call.

By the end of 2007, Phase I was 97 percent complete; the only work remaining to be done was finish work, installing the countertops and flooring. In conjunction with other Phase I work, Advent had also constructed the building pads and underground plumbing to commence Phase II. However, due to the Bank's failure to pay on

7

outstanding payment applications, Advent did not have money to pay subcontractors to complete the construction. Because the finish work was incomplete, the developer could not obtain a certificate of occupancy, required to sell the homes.[2] If all the payment applications had been timely funded, all of Phase I would have been completed and put up for sale by December 2007, and the loan could have been repaid by the maturity date.

At around the time that the Bank withheld payment on Advent's payment applications, the Bank's extremely high rate of problems placed it in jeopardy of failing. On January 8, 2008, Advent e-mailed Stratus that one of its subcontractors had submitted an Intent to Lien for nonpayment of the portion of its contract in retention due to nonpayment for work done. Stratus immediately forwarded Advent's e-mail to Sean Johnson at the Bank, inquired about the unpaid draw requests, and informed the Bank of the subcontractor's intent to lien. Stratus also informed the Bank that two units were closing [escrow], and three homes had been sold over the weekend. The Bank responded that it would see if it was able to fund.

Also in January 2008, the Bank employed a special assets manager, Mark Whalen, who handled troubled loans. At this point, the loan was not in default. On February 6, 2008, Stratus sent another e-mail to the Bank regarding additional unpaid draw requests. On February 11, 2008, Whalen executed a Declaration of Default and Demand for Sale,

---

[2] Between December 2007 and January 2008, approximately one-half of the homes were either in escrow or had deposits paid. However, some buyers canceled the purchase contracts because a certificate of occupancy was required in order to close escrow.

which signified that the loan was in default. However, the Bank did not record it immediately (it was recorded in April 2008), or serve it upon Five Corners, nor did it serve Five Corners with a Notice to Cure, as required by the loan agreement before it could be declared in default.[3] On February 12, 2008, the Bank e-mailed Stratus to set up a meeting to discuss the Project, and the funds needed to complete it. The loan matured on February 28, 2008, but Five Corners could not pay it.[4] Notwithstanding the default, the Bank asked Five Corners to continue working on the Project.

After the loan matured, Whalen and the borrowers discussed a strategic plan of action. In order to preserve the collateral, Five Corners needed to keep working to finish Phase I of the Project. At this point, the Bank began to take a more active role. The Bank instructed Five Corners to do things not otherwise included in the scope of work and required Five Corners to obtain Bank approval before making any decisions regarding the Project.

---

[3] According to Whalen, the loan documents did not require the Bank to notify the borrower of a default. This is contradicted by the language of the loan agreement itself, which required the Bank to serve a 15-day Notice to Cure to the borrower in the event of a default. It is also a position contrary to law, where Civil Code section 2923.5 prohibits a mortgage servicer, mortgagee, trustee, beneficiary or authorized agent from recording a notice of default (pursuant to Civ. Code, § 2924) until 30 days after initial contact is made with the borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure, or 30 days after complying with certain due diligence requirements.

[4] Prior to the loan's maturity, the Bank did not consider the loan to be in default. Nevertheless, the Bank signed a Declaration of Default and Demand for Sale on February 11, 2008, before the loan had matured, to commence nonjudicial foreclosure proceedings.

Five Corners and the Bank met and agreed on a "global strategy." The borrowers understood that if they complied with the Bank's directions, it would result in a modification of the loan or a release from the guarantees. On April 9, 2008, after a conference call with Andrew and David Wood, and Thomas DelPonti, Mark Whalen sent an e-mail summarizing the meeting and outlining the "Global Strategy" for the Project. In bullet points, the e-mail outlined that "we agreed" upon certain things.

Among other things, the parties agreed to use Accelerated Marketing to do a "ballroom style" auction; the Bank would fund marketing costs estimated at $150,000; work was to be done to finish the pool and recreation area to make it operational, clean up the Phase II site, install a permanent wood fence between Phase I and Phase II to improve the overall appearance of the project; the Guarantors were to obtain discounts of 25 to 50 percent from all the major subcontractors "in order to get them paid current"; the borrowers were to submit a plan and budget for the auction, as well as the payment and discount of the major contractors; the Guarantors[5] would continue to work on the project in order "to mitigate damages to [the Bank] and to themselves" as Guarantors; the Bank "was Ok with doing the auction and OK with paying the subcontractors, but the pain need[ed] to be shared [by] all participants"; and the Guarantors would go back to PRG regarding a more acceptable price proposal for the purchase of the promissory note.

_____

[5] Whalen referred to all three of the principals involved, Andrew Wood, David Wood, and Thomas DelPonti, as Guarantors, although only David Wood and Thomas DelPonti actually executed commercial guarantees.

10

The Bank's requirement that Advent construct a fence dividing Phase I from Phase II was not included in the original construction agreement. Additionally, the Bank required upgrades of units, changing the specification level, altering finishes, and negotiating different payment terms. For homes sold and in escrow, the Bank demanded 100 percent of the sale proceeds, instead of the 70 percent originally required by the loan agreement. Five Corners felt it had no choice but to comply with the Bank's demands.

Five Corners advised Advent that the Bank required discounts from all the subcontractors on unpaid claims and informed Advent that the Bank would pay the subcontractors. Advent approached its subcontractors, but the subcontractors were unwilling to return to the site to complete the work without being paid, and were preparing to file liens. Advent eventually negotiated discounts from all but two of the subcontractors, and paid the subcontractors who agreed to discounts out of its own pocket, to keep the property lien-free.[6]

It was important to the Bank that the homes being built be free of mechanic's liens, because the units could not be sold with liens attached, so it required the developer and contractor to keep the project lien-free. Of the $9,588,156 that Advent should have been paid, it received $8,516,971, leaving $1,071,185 unpaid, before discounts.

Advent finished up the pool area, the recreation room, the landscaping, and constructed a fence to separate Phase I from the incomplete Phase II. Advent never

---

[6] Signature Interiors and VCI Construction subsequently filed bonded stop notices and instituted their own lawsuit for repayment, which was resolved prior to trial in the instant matter.

received payment for the unpaid payment applications, which, after deducting what the subcontractors agreed to discount, left $814,084.55 due.

Meanwhile, pursuant to the "global strategy," Five Corners signed a contract for an on-line auction with the Bank's approval, which would maximize return from the sales of the units. The payment for the auction's advertising budget was to come from the proceeds after escrow of a sold unit. Additionally, PRG entered into negotiations with the Bank for the purchase of the Five Corners promissory note, as well as one or two other notes.[7] PRG wanted to own the notes before proceeding with the auction.

On June 12, 2008, PRG, which was negotiating for the purchase of the Five Corners promissory note, requested that the auction be delayed for a few weeks, until after it had purchased the promissory note from the Bank. During the negotiations for the purchase of the note, PRG made an offer requesting a discount from the Bank. The Bank never responded.[8]

The note sale fell through shortly before the Bank foreclosed on the property. On June 26, 2008, the Bank filed a first amended complaint against Five Corners, Stratus and Genesis for Specific Performance of Deed of Trust/Appointment of Receiver, Injunctive

---

[7] The testimony indicated that PRG would purchase three notes from the Bank, but PRG's actual offer referred to only two notes.

[8] Whalen testified on behalf of the Bank that at some point prior to August 2008, the Bank had reached an agreement with PRG for the sale of the note, although no escrow had opened. According to Whalen, PRG changed its mind. However, the e-mails which Whalen acknowledged receiving showed that no agreement for the sale of the note was ever actually reached.

12

Relief, Breach of Contract (two separate causes of action against the two Guarantors), Breach of Contract (third party beneficiary, relating to auction contract), Promissory Estoppel (relating to defendants' promise to auction the property), and Interference with Prospective Advantage (relating to defendants' alleged cancellation of the auction agreement).

On July 10, 2008, the Bank issued a Notice of Trustee's sale of the property, however it explained to Five Corners that it was merely preserving its rights and would move forward with the auction. On July 21, 2008, Advent served an unbonded Stop Notice on the Bank.

On August 6, 2008, Stratus e-mailed the Bank seeking approval to proceed with the auction before foreclosure so the homes could be marketed as a builder "close-out" rather than the sale of "bank owned" property. Stratus was concerned that values would be impacted if the auction related to "bank owned" property, and it sought to perfect the Bank's collateral in order to maximize its repayment. Despite Bank's assertions that Five Corners and its principals had cancelled the auction, neither Five Corners, nor PRG, nor any of the individual principals cancelled the auction. Instead, at some point, the Bank contacted the auction company and obtained a refund of the advertising costs it had paid, which constituted a cancellation of the auction, since the auction could not be launched without the funds. The foreclosure proceeded, and on August 12, 2008, the Trustee's Deed Upon Sale was recorded.

On August 19, 2008, Advent filed a complaint against Five Corners and the Bank for Foreclosure of Mechanic's Lien, Enforcement of Stop Notice, Injunctive Relief (for release of construction loan funds), Breach of Contract (against Five Corners), Quantum Meruit, Common Counts, Violation of Civil Code Sections 3260, 3260.1, and Declaratory Relief.[9]  On October 29, 2008, the Bank filed a cross-complaint in the Advent action against Five Corners, the two Guarantors, Stratus and Genesis, seeking Contractual Indemnity, Implied Indemnity, Contribution, and Declaratory Relief.  On May 28, 2009, the actions were consolidated.  On September 22, 2009, California Bank and Trust (still referred to as the Bank) substituted in for Vineyard Bank, as a result of a receivership in which California Bank and Trust received an assignment of Vineyard's assets.

Prior to trial, Advent dismissed its causes of action for injunctive relief and promissory estoppel as to Five Corners, only.  It also dismissed the cause of action relating to enforcement of the mechanic's lien.  On July 24, 2009, the Bank dismissed its complaint as against Genesis, only.  Five Corners defaulted as to the remainder in the action brought by Advent, resulting in a judgment by default in favor of Advent and against Five Corners in the amount of $1,050,980.52, plus prejudgment interest and costs, which was entered on November 9, 2009.

---

[9]  On July 3, 2008, VCI Telecom, Inc., dba VCI Construction, filed a complaint for breach of contract and related causes of action against Advent, Five Corners, and the Bank.  On July 28, 2008, Signature Interiors filed a similar complaint against Advent and Five Corners.  Those actions were settled, and both actions were dismissed.

The matter proceeded to trial by court on Advent's cause of action against the Bank on the stop notice and for payment of unpaid invoices, and the Bank's action against the Guarantors for the deficiency.  After the close of evidence, Advent made a motion to amend its complaint to conform to proof, to add the Bank as a defendant in its breach of contract cause of action (based on the assignment of the construction contract to the Bank), and to add a cause of action for promissory estoppel against the Bank.

On November 22, 2010, the court issued its Final Statement of Decision.  The court granted Advent's motion to amend its complaint to conform to proof.  The court found the Bank breached the loan agreement with Five Corners and was liable to Advent as assignee of the prime contract, and under principles of promissory estoppel.  The court concluded Bank failed to provide the 15-day Notice to Cure under the loan agreement prior to executing the Notice of Default, and had withheld funds to pay approved fund requests, which doomed the project, and constituted a material breach of the loan agreement.  The court also determined that the Bank had taken over the construction contract, accepting both its benefits and its burdens, and had the effect of creating a new contract with Advent, enforceable by a cause of action for promissory estoppel.

However, the court found Advent was not entitled to enforce or recover prejudgment interest on the Stop Notice claim, although it awarded statutory interest on the amount made certain from the date of filing suit, pursuant to Civil Code section 3287, subdivision (b) on the balance of the action.  In the Bank's action against the Guarantors, the court found in favor of Guarantors.

15

On January 5, 2011, judgment was entered for Advent for $781,912.21, plus 10 percent interest ($185,486.95) from August 20, 2008 to the date of judgment. On April 25, 2011, the judgment was amended to include Advent's costs of suit in the amount of $13,462.70, and its attorney's fees in the amount of $276,430, as well as the Guarantors' attorney's fees in the amount of $85,515, and their costs of suit in the amount of $2,917.

On March 8, 2011, the Bank filed its notice of appeal from the judgment following court trial. Advent appealed that portion of the judgment rejecting its stop notice claim. Subsequently, the Bank also appealed from the order awarding attorneys' fees.

## II.

## DISCUSSION

1. *The Bank's Appeal*

A. *The Court Properly Granted Advent Leave to Amend Its Complaint to Conform to Proof.*

The Bank argues the trial court abused its discretion by granting Advent leave to amend its complaint to conform to proof, to add the Bank as a named defendant in its Breach of Contract cause of action, and to add a cause of action for Promissory Estoppel. We disagree.

The trial court, in the furtherance of justice, may allow amendment of a pleading. (Code Civ. Proc., § 576; *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 230.) Leave to amend a complaint is entrusted to the sound discretion of the trial court and the exercise of that discretion will not be disturbed on appeal absent a clear showing of

16

abuse.  (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 909.)  Amendments to conform to proof, if not prejudicial, are favored since their purpose is to do justice and avoid useless litigation.  (*Ibid.*)  One of the reasons for the policy of liberality in allowing amendments to pleadings, even up to and including trial, is to avoid the loss of a meritorious cause of action (or defense) because counsel simply forgot to include it in an earlier pleading.  (*Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal.App.4th 172, 210-211, citing *City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1563.)

In ruling on a motion to amend a complaint during trial, a court should be guided by two general principles:  (1) whether facts or legal theories are being changed, and (2) whether the opposing party will be prejudiced by the proposed amendment.  (*Garcia v. Roberts, supra,* 173 Cal.App.4th at p. 909, citing *Union Bank v. Wendland* (1976) 54 Cal.App.3d 393, 400.)  The amended pleading must be based on the same general set of facts as those upon which the cause of action or defense as originally pleaded was grounded.  (*City of Stanton v. Cox, supra,* 207 Cal.App.3d at p. 1563.)  Amendments to conform to proof should not be permitted if they raise new issues not included in the original pleadings and upon which the adverse party had no opportunity to defend. (*Garcia v. Roberts, supra,* at p. 909, citing *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.)

Here, the trial court properly exercised its discretion.  Advent was not a signatory party to the construction loan contract and proceeded to trial on claims of breach of its

contract with the developer and claims against the Bank related to the stop notice. At trial, Bank officers testified that the Bank had an assignment of the general contractor's contract. Mark Whalen, who handled troubled loans or distressed assets at the Bank, testified that the practice of taking an assignment of a construction contract gave the Bank the right to deal directly with the contractor, to step into the shoes of the developer.

Other evidence adduced during trial revealed that the Bank had entered into an agreement with the developer to complete Phase I of the Project, and to auction the homes. Advent completed the construction, including additional work not included in the scope of the original agreement, based on assurances that it would be paid. The e-mail sent by Whalen to the Guarantors setting forth what they had "agreed upon as a global strategy" to finish the project, showed the Bank had taken control of the Project. Whalen's e-mail agreed that payment would be made if Advent obtained discounts from its subcontractors by stating, "Go back to all the major subcontractors and require a discount of 25% to 50% in order to get them paid current" where the "alternative [was] to finish the foreclosure process and the subcontractors risk being paid zero." The Bank made a promise to pay Advent, and Advent relied on that promise to its detriment in performing work, including work not included in the original scope of its construction contract, in order to get paid.

We conclude that the amendment was based on the same general set of facts and issues included in the original pleadings, and that the Bank was not prejudiced by the amendment. The amendment was properly allowed.

B.  *There Was No Judicial Misconduct.*

The Bank argues that the court became "improperly embroiled in the action" in its discussions with counsel, and committed misconduct by suggesting that there was evidence to support a promissory estoppel theory of liability.  We disagree.  The Bank cites no authority to support its position that the trial court was improperly embroiled, citing only decisions involving improper judicial expression of negative opinions about attorneys and other examples of bias for or against a party.

Embroilment is the process by which the judge surrenders the role of impartial fact finder/decision maker, and joins the fray.  (*Inquiry Concerning O'Flaherty* (2010) 50 Cal.4th Comm. Jud. Perf. Supp. 1, 13.)  A judge who prevents an attorney from presenting his or her case in a satisfactory manner denies a fair trial to the party.  (7 Witkin, Cal. Procedure (5th ed., 2008) Trial, § 247, p. 300.)

However, in the exercise of a judge's broad powers to control the proceedings, a trial judge has the right and duty to expedite the trial, and, if necessary in the interests of fairness and efficiency, to participate therein.  (*People v. Carlucci* (1979) 23 Cal.3d 249, 255-256; *People v. Wrigley* (1968) 69 Cal.2d 149, 164, citing *People v. Martinez* (1952) 38 Cal.2d 556, 564.)  In a bench trial, the court may even call witnesses on its own motion during trial.  (Evid. Code, § 775.)

A trial court is also permitted to make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause.  (Cal. Const., art. VI, § 10.)  Statements of opinion based

19

upon "convictions and conclusions" drawn by the judge acting as a trier of fact and uttered in discharge of what the judge considers to be a part of his official duties are not evidence of bias or prejudice.  (*Smith v. Arthur D. Little, Inc.* (1969) 276 Cal.App.2d 391, 401-402.)

"'The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered.  It is not only the right but the duty of a trial judge to so supervise and regulate the course of a trial that the truth shall be revealed in so far as it may be, within the established rules of evidence.'"  (*People v. Martinez, supra,* 38 Cal.2d at p. 564, quoting *People v. Mendez* (1924) 193 Cal. 39, 46 [disapproved on a different point in *People v. McCaughan* (1957) 49 Cal.2d 409, 420]; see also *People v. Cummings* (1993) 4 Cal.4th 1233, 1305; *People v. Spector* (2011) 194 Cal.App.4th 1335.)

The Bank cites *Iloff v. Purity Stores, Ltd.* (1960) 178 Cal.App.2d 1, 4, *Lewis v. Bill Robertson & Sons, Inc.* (1984) 162 Cal.App.3d 650, 656, and Rothman (California Judicial Conduct Handbook) section 2.01, as support for its position that the judge was improperly embroiled.  The *Iloff* decision involved instructional error and did not mention judicial misconduct, although the trial court's statements in that case indicated that its motivation in giving the erroneous instruction was improper.  That case is unhelpful.

In *Lewis v. Bill Roberston & Sons, Inc., supra,* 162 Cal.App.3d 650, the court made comments to the jury that it believed the jury had heard an impassioned plea for

20

prejudice and passion which was not based on the evidence, and offered his opinions that the plaintiff's original injury was not caused by a defect in the defendant's premises. The reviewing court acknowledged that a court has the power of comment, but that comments must be kept within certain bounds, and that while it may express an opinion on negligence, its remarks must be appropriate and fair. (*Id*. at p. 654.) This case is easily distinguishable from *Lewis* insofar as there was no jury. More significantly, the court's comments in the present case specifically indicated it had "not closed the door" or made any prejudgment of the issues in the case.

The Bank also complains "The Court then invited Advent to pursue new claims against Vineyard," and that the trial court directed the parties to prepare posttrial briefs and "told Advent to address its request to 'conform the pleading to proof'" in its brief. We have found no such direction or suggestion in the record, and the lack of citation to the record to support this statement implies there was none. Instead, Advent requested leave to amend.

The record of the first day of trial shows the court discussed various legal theories with counsel, such as informing Advent that it could not pursue equitable estoppel, mentioning the possibility of fraud on the part of the Bank, as well as the issue of the Bank stepping into the shoes of the developer. But it also indicated it was not foreclosing the possibility that the door was closed on assignment issues.

The record of the morning session for the following day contains no references to posttrial briefing, but there was no direction by the court to Advent to address "its

21

[Advent's] request to conform the pleading to proof." The next day, the only mention of briefing was when the Bank's trial counsel informed the court he had prepared briefing on the assignment issue, just before the court adjourned for the day. After that discussion, Advent's counsel asked the court if it wanted to discuss its comments from the previous day regarding the theories of liability "in terms of relevance and channeling the witnesses," and asked the court if it was inclined to discuss the case on the issue of the stop notice. However, the court stated it had indicated where it thought the parties should be exploring and that it would "leave it up to you."

The record of oral proceedings on March 29, 2010 contains no discussion of briefing. The record for the morning session of March 30, 2010 indicates there was an off-the-record discussion. At the beginning of the afternoon session that day, the court referred to "what I indicated this morning . . . ," suggesting that the parties explicate their respective allegations in posttrial briefing. When the court adjourned for the day, it indicated it would reconvene on Friday for the testimony of Andrew Wood, "and that is all I am going to hear." The court then indicated, "The matter will then be considered up to Counsel to advise the court in writing what their positions are as I indicated earlier."

On Friday, after the court heard witnesses' testimony and before the court recessed for the noon hour, the parties discussed the admission of certain documentary exhibits. The court then provided all counsel with instructions for the format for their briefs and suggested a briefing order. Advent's counsel indicated he had nothing to add on the issue of timing as far as moving to conform the pleading to proof. The court instructed

22

Advent's counsel to "[p]ut that in your brief as you are moving by your brief to conform to proof." In the afternoon session, witness testimony resumed. At the conclusion of the witness testimony, exhibits were moved into evidence, and an off-the-record discussion was held prior to adjournment for the day.

The record does not support an inference that the court became improperly embroiled in the action, although one year later, when considering motions for attorneys' fees, the court was concerned about the Lodestar[10] calculation because the prevailing theory had been "inspired" by the court's comments. However, it is not misconduct to "inspire" an attorney where the court's participation has been appropriate and fair. Without an adequate record, we must presume the court discharged its official duty properly. (Evid. Code, § 664.)

Additionally, the Bank never objected to any of the court's discussions of legal theories. Some of the court's comments during the bench conferences were favorable to the Bank, such as where the court pointed out Advent's problems with Civil Code section 3162. Failure to object to misconduct results in forfeiture. (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1219, citing *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

---

[10] The court reporter transcribed the court's reference as to a "Lonestar" amount. However, the "lodestar" is the basic fee for comparable legal services in the community, which can be adjusted by the court, depending on factors present. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)

We acknowledge that a failure to object will not result in forfeiture where an objection and an admonition could not cure the prejudice caused by the misconduct, or when objecting would be futile. (*Haluck v Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1007.) But that is not the case here. The discussion of alternative theories of liability was precipitated by the testimony of Bank officers Ryan Clark and Mark Whalen, who described the assignment of the construction contract and significance thereof. The Bank did not object to questions about the assignment, and, during bench conferences in which the court indicated that the assignment affected its view of the legal theories being presented, the Bank did not object to the court's expression of views.

The judge's comments were based upon actual observance of the witnesses and the evidence given during the trial of an action, so they do not amount to prejudice against a litigant which disqualifies him in the trial of the action. (*Kreling v. Superior Court* (1944) 25 Cal.2d 305, 312; *Jack Farenbaugh & Son v. Belmont Constr., Inc.* (1987) 194 Cal.App.3d 1023, 1031.) It is the judge's duty to consider and pass upon the evidence produced before him, and when the evidence is in conflict, to resolve that conflict in favor of the party whose evidence outweighs that of the opposing party. (*Kreling v. Superior Court, supra,* at p. 312.) The opinion thus formed, being the result of a judicial hearing, does not amount to bias and prejudice. (*Moulton Niguel Water Dist. v. Colombo, supra,* 111 Cal.App.4th at p. 1219, quoting from *Kreling v. Superior Court, supra,* at p. 312.)

24

The judge's comments and opinions, which the judge was careful to state did not close the door, were the result of a judicial hearing, were not objected to, and were not prejudicial.

C.  *Applicability of Civil Code Former Section 3264*[11] (*Now Section 8500*).

The Bank argues that the judgment in favor of Advent violated Civil Code former section 3264, which prohibits contractors from asserting any legal or equitable right respecting any fund for payment of construction costs.  The Bank asserts that this statute proscribes claims based on theories such as unjust enrichment, (promissory) estoppel, or implied reliance on payment from the construction fund.  We disagree.

The theory of promissory estoppel does not involve an equitable lien.  Promissory estoppel is used to satisfy the requirement that consideration must be given in exchange for a promise sought to be enforced.  (*Raedeke v. Gibralter Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 672.)  Under the (now abolished) theory of equitable lien, courts previously held that a person who was induced to supply labor and materials in reliance upon the construction loan fund could assert a lien against that fund.  (*Connolly Development, Inc. v. Superior Court* (1976) 17 Cal.3d 803, 827, fn. 25 (*Connolly Development*), citing *Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn.* (1988) 205 Cal.App.3d 1415, 1419.)  Thus, an equitable lien is distinguishable from unjust enrichment.  (*Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn., supra,* at pp. 1421-1422.)  Although

_____

[11]  Civil Code former section 3264 was repealed in 2012, and was replaced by Civil Code section 8500.  Because the case arose before the repeal, we will refer to the former code sections.

promissory estoppel employs equitable principles (*Raedeke v. Gibralter Sav. & Loan Assn., supra,* at p. 672), it does not establish a lien on a particular fund.

There was no judgment enforcing an equitable lien in this case. The court rendered a judgment for damages in favor of Advent under the doctrine of promissory estoppel. The statutory bar against enforcement of equitable liens is inapplicable.

D. *Substantial Evidence to Support the Judgment in Favor of Advent.*[12]

The Bank argues that the trial court erred in finding the Bank liable under the construction contract under several theories: (1) That Advent was estopped from recovering on the construction contract after proceeding to judgment against the borrower on the same claim; (2) the Bank was not liable to Advent under the assignment, regardless of any improved collateral; and (3) there was insufficient evidence to establish that the Bank exercised the assignment. We disagree.

(1) *Advent Was Not Collaterally Estopped from Recovering Against the Bank after Obtaining a Default Judgment Against the Borrower*.

The Bank argues that principles of collateral estoppel bar Advent from recovering under the construction contract. The Bank is mistaken and it forfeited this claim by failing to present it in the trial court.

Collateral estoppel is an aspect of res judicata, which gives conclusive effect to a former judgment in subsequent litigation between the *same parties* in the same cause of

___

[12] Advent made a motion to present new evidence on appeal to counter the Bank's arguments that the elements of promissory estoppel had not been satisfied. We deny the motion as it is irrelevant to our analysis of the issue.

26

action.  (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 866.)  Collateral estoppel involves a second action between the same parties on a different cause of action; the first action is not a complete merger or bar, but operates as an estoppel or conclusive adjudication as to such issues in the second action which were actually litigated and determined in the first action.  (*Id.* at p. 867.)  Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.  (*Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 286.)

A judgment of default in a civil proceeding is res judicata as to all issues pleaded in the complaint, and the defendant is estopped from denying, in a subsequent action, any allegations contained in the former complaint.  (*Dailey v. City of San Diego* (2013) 223 Cal.App.4th 237, 257-258, quoting *Murray v. Alaska Airlines, supra,* 50 Cal.4th at p. 871.)  The application of the doctrine of collateral estoppel depends on whether the *issue* in both actions is the same, not whether the issue arises in the same *context.*  (*First N.B.S. Corp. v. Gabrielsen* (1986) 179 Cal.App.3d 1189, 1195-1196.)  When determination of an issue was entirely unnecessary to the former judgment, it will not have collateral estoppel effect.  (*Id.* at p. 1196.)

However, collateral estoppel must be proved in the trial court or it is waived. (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 332; *Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89.)  Cases permitting the issue to be raised for the first time on appeal involve situations in which

27

the prior action was still pending on appeal at the time of the trial in the subsequent action.  (See *First N.B.S. Corp. v. Gabrielsen, supra,* 179 Cal.App.3d at p. 1195.)  That situation is not present here, so the issue was forfeited.

Even if we reached the merits, there is no identity of parties or issues.  (See *Dillard v. McKnight* (1949) 34 Cal.2d 209, 218 [judgment entered against another party in a prior trial did not operate as a matter of law to conclude the rights of his copartners, defendants in the present action].)  Advent's action against the Bank was based on the stop notice and promissory estoppel.  Those issues were not litigated in the action in which Five Corners defaulted.  Thus, even if the issue could be considered for the first time on appeal, no reversal would be compelled.

### (2)  *The Bank Was Liable to Advent Under the Assignment*.

The Bank argues that it was not liable to Advent under the assignment because the assignment was for security only, which transferred the rights but not the obligations under the assigned construction contract.  We disagree.

A voluntary acceptance of the benefit of a transaction is equivalent to consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.  (Civ. Code, § 1589.)  In other words, "He who takes the benefit must bear the burden."  (Civ. Code, § 3521.)  An "assignment for security" transfers the rights but not the obligations inherent in the assigned contract.  (*Black v. Sullivan* (1975) 48 Cal.App.3d 557, 566.)  The Bank relies heavily on *Black*, which involved an

28

assignment of a promissory note and deed of trust made expressly for the purpose of security. The case did not involve the assignment of a construction contract.

In *Black v. Sullivan, supra,* 48 Cal.App.3d the court held that the assignees for security only of a note and a deed of trust had no statutory duty to supply to the debtors-trustors the beneficiary statement providing information as to the status of the deed of trust and note, as required by Civil Code section 2943. The beneficiaries' attorneys had taken assignments of the beneficiaries' interests expressly for security for loans and for past and future attorneys' fees, giving the attorneys a personal interest in regaining the property by preventing the sale by the plaintiffs. The court held that the attorneys were not personally obligated to provide the statement required by Civil Code section 2943 because the assignments of the deed of trust and note were for security only. (*Black v. Sullivan*, *supra*, at p. 567.)

The Bank argues that the assignment of the construction contract was for security because that is what its witnesses said at trial. The Bank, however, has overlooked other testimony by its officers that led the trial court to conclude the assignment was *not* simply for security. First, Sean Johnson, a former officer of Vineyard Bank who oversaw construction and real estate assets, testified that the assignment was a "form of surety" for the Bank, but he also testified that the Bank might have to step in and act as the contractor, and that if the borrower was in default or foreclosure took place, it gave the lender the right to "take any contracts that the contractor may have and exercise those contracts to complete the project."

29

Next, Mark Whalen, the Bank's former officer in charge of troubled loans, testified that the assignment of the construction contract gave the Bank authority to deal directly with the vendors, such as the general contractor. Ryan Clark, former special assets manager for Vineyard Bank, also testified that the assignment of the construction contract provided the Bank may perform the obligations of the assignor, but is not required to do so.

While the Bank's witnesses expressed their opinions that the assignment was for security, the interpretation of a contract is a legal question for the court. (*Legendary Investors Group No. 1, LLC v. Niemann* (2014) 224 Cal.App.4th 1407, 1413; see also *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444 [witness's opinion as to the meaning and legal effect of a contract is inadmissible as to interpretation of the contract].) The language of the assignment of the construction contract does not indicate it was for security only.

In this respect, the trial court correctly followed the equitable maxim that "He who takes the benefit must bear the burden." (Civ. Code, § 3521.) We agree: No person can be permitted to adopt that part of an entire transaction which is beneficial to him or her, and then reject its burdens. (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 84, citing *Halperin v. Raville* (1986) 176 Cal.App.3d 765, 772.) The Bank's effort to characterize the assignment of the contract as for security purposes only was contradicted by the evidence that it had stepped into the developer's shoes. There is substantial evidence to support the trial court's finding that the assignment was not for security.

(3) *There is Ample Evidence to Establish That the Bank Exercised the Assignment*.

The Bank argues there was insufficient evidence to support the trial court's conclusion that the Bank actually exercised its rights under the assignment because it did not assume the obligations in writing. The Bank asserts that the construction loan agreement provided that the assignment provisions of the loan agreement relieved the Bank of any obligations thereunder unless it agreed to assume such obligations in writing. We disagree.

Civil Code section 1641 provides that the whole of a contract is to be taken together, so as to give effect to every part, if reasonable, each clause helping to interpret the other. Our objective in construing the language used in a contract is to determine and effectuate the intention of the parties. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166.) If contract language is clear and explicit, it governs. (*Horath v. Hess* (2014) 225 Cal.App.4th 456, 463.) If it is ambiguous, the court must construe the ambiguous contract language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties. (*Id*. at p. 464.)

The interpretation of a written instrument is essentially a judicial function, when based on the words of the instrument alone. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395.) On appeal, we independently review and interpret the instrument. (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 134; *Estate of Dodge* (1971) 6 Cal.3d 311, 318.) An appellate court is not bound by a

31

construction of the contract based solely upon the terms of the written instrument without the aid of evidence where there is no conflict in the evidence, or a determination has been made upon incompetent evidence.  (*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1500.)

Here, the Assignment of Construction Contracts provides, in part, "that from and after the time of any such default, Lender immediately shall become entitled, but shall not be obligated, to exercise any rights of Assignor under the Construction Contract and at Lender's option, to perform Assignor's obligations under the Construction Contract, if any."  Nothing in the language of this assignment requires the Bank to execute a writing in order to make it effective.  Nor does the loan agreement to which the Bank refers, entitled "Completion of Improvements by Lender," which applies if the lender takes possession of the collateral, require a writing to render the assignment effective.

In any event, the record establishes that the Bank's officers understood that in the event of the borrowers' default, the Bank could step into the shoes of the developer to finish the Project.  The Bank presented no evidence that a writing was required to impose on it the obligations of the assigned contract.

On the other hand, there *is* evidence that the Bank exercised the Assignment in writing.  Whalen sent an e-mail to the principals of Five Corners outlining a "global strategy."  The "global strategy" was a course of action the Bank required by the borrowers and Advent.  To the extent the Bank felt a written exercise of the assignment was required, Whalen's e-mail satisfied any such requirement.  After all, without the

assignment, the Bank would have no authority to demand any performance by the general contractor or the subcontractors under the construction contract. By e-mailing its directions for further work on the Project to the borrowers, requiring the borrowers to obtain the Bank's approval before making any decisions, the Bank exercised the assignment.

Substantial evidence supports any finding the trial court may have been required to make that the Bank exercised the assignment.

(*4*) *Substantial Evidence Supports Judgment for Advent Under the*

*Doctrine of Promissory Estoppel.*

The Bank argues that the trial court erred in finding it liable to Advent on a promissory estoppel theory. The Bank also argues that Advent withdrew its claim, by stating at the inception of trial that it was basing its claim on the stop notice statute. We disagree.

Preliminarily, we reject outright the Bank's claim that Advent withdrew the promissory estoppel theory at the inception of the trial. First, that cause of action had not even been pled at that stage. Further, the statement was made during discussion of Advent's cause of action to enforce the unbonded stop notice and related to the applicability of an estoppel to support Advent's right to recover, given the lack of bond. (Referring to *H.O. Bragg Roofing, Inc. v. First Federal Sav. & Loan Assn.* (1964) 226 Cal.App.2d 24, 28.)

33

Finally, responding to the Bank's posttrial brief in which it made the same claim, the trial court made a specific factual finding that Advent "never said it was not asserting a promissory estoppel claim against the Bank." The Bank does not argue that the finding was not supported by substantial evidence. Any discussion of withdrawing a claim of reliance or estoppel was made in the context of a possible equitable estoppel theory relating to the unbonded stop notice. Because Advent had not yet amended its complaint to allege a promissory estoppel cause of action, it could not have withdrawn it.

On the merits, promissory estoppel is a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Auth.* (2000) 23 Cal.4th 305, 310.) The elements of promissory estoppel are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person, (3) the promise induces action or forbearance by the promisee or a third person (detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise. (*West v. JP Morgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 803.)

For a promise to be enforceable, it need only be definite enough that a court can determine the scope of the duty, and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages. (*West v. JPMorgan Chase Bank, N.A., supra,* 214 Cal.App.4th at p. 804, citing *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 209.) Because promissory estoppel is an equitable doctrine

to allow enforcement of a promise that would otherwise be unenforceable, courts are given wide discretion in its application. (*U.S. Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 902.)

We review the record to determine whether the judgment is supported by substantial evidence. (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp.* (2013) 221 Cal.App.4th 867, 877.) We view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1096.) We do not reweigh the evidence or draw contrary inferences. (*Guimei v. General Electric Co.* (2009) 172 Cal.App.4th 689, 698-699.) And we do not limit our review to selective evidence favorable to the appellant. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) An appellant who cites and discusses only evidence in its favor waives the contention that the evidence is insufficient to support the judgment. (*Ibid.*)

In the present case, there is abundant evidence to support a judgment under the doctrine of promissory estoppel. Whalen's e-mail, outlining the "global strategy," required Advent to "Immediately begin work to finish the pool and recreation area to make it operational, cleanup the phase two site, install a permanent wood fence between phase one and two and improve the overall appearance of the project." Further, Advent

was required to "Go back to all the major subcontractors and require a discount of 25% to 50% *in order to get them paid current.* This is being required by the Bank as our alternative to finish the foreclosure process and the subcontractors *risk being paid zero*." (Italics added.)

Only a very strained reading of the bullet points in Whalen's e-mail could support a conclusion that the Bank was not promising to pay for the additional work. Whalen's use of the words, "Here is what we agreed upon" indicates a contractual promise. Although Whalen and other Bank witnesses attempted to backpedal by testifying that no one had promised to pay Advent for the additional work, it was for the court to evaluate the credibility of this self-serving testimony as against the language of the e-mail and the testimony of the Guarantors and Advent that the Bank had promised to pay for the additional work. As Jason Donahue, Advent's Senior Project Manager, stated, Advent did not volunteer the payments, they expected to be reimbursed.

The "global strategy" e-mail to the Guarantors plainly anticipated that Advent would finish the construction and do additional work beyond the scope of the construction contract, and that Advent would obtain discounts for work previously billed from Advent's subcontractors. This evidence supports the finding that the Bank promised the Guarantors it would pay the subcontractors to "get them paid current," with the knowledge that the Guarantors would induce Advent, and the subcontractors, to do more work. The promise was sufficiently definite. If we were to assume the Bank did not promise to pay for work it demanded, we would have to assume the Bank

36

fraudulently induced the Guarantors to solicit cooperation from Advent and its subcontractors, but the result would be the same.

Furthermore, the assignment of the construction contract put the Bank in the shoes of the developer, giving it contractual privity with Advent, and included Advent in the promises made. (*Vallely Invs. v. Bancamerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 822 [where an assignee assumes the obligations of a lease, the assumption agreement creates a new privity of contract between the landlord and the assignee].) It has long been held that an assignee of a contract becomes bound to perform its obligations without express agreement when full performance has been received by him. (*Silva v. Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773-774; *Recorded Picture Co. Ltd. v. Nelson Entertainment* (1997) 53 Cal.App.4th 350, 362.) Assumption of the obligations may be implied from acceptance of benefits under the contract. (*Recorded Picture Co. Ltd. v. Nelson Entertainment*, *supra*, at p. 362.) No express assumption of those obligations by an assignee is necessary. (*Weidner v. Zieglar* (1933) 218 Cal. 345, 350, relying on *Brady v. Fowler* (1920) 45 Cal.App.592, 593.)

Standing in Five Corners's shoes, the promises made by the Bank to Five Corners in the e-mail relating to the "global strategy," included Advent. There is substantial evidence to support the court's finding that Advent was entitled to recover under the theory of promissory estoppel.

E. *Substantial Evidence to Support the Judgment in Favor of the Guarantors*.

The Bank argues that the court erred in rendering judgment in favor of the Guarantors in the Bank's action to collect the deficiency owed under the guarantees. The trial court's judgment in favor of the Guarantors was grounded upon its finding that the Bank materially breached the loan agreement by refusing to honor the four payment applications that had been approved. Further, the court found that the Bank led the Guarantors to believe they would be released from the guarantees if they performed all the items listed in the "global strategy" e-mail from the Bank.

There is substantial evidence to support the court's findings insofar as the e-mail unambiguously states that the parties had reached an agreement that would "mitigate" the Guarantors' damages if they performed certain tasks. The Guarantors did everything expected of them and performed according to the new agreement to the extent the Bank permitted.[13] The Bank does not discuss or challenge the trial court's factual findings, including the court's finding that the Bank was guilty of willful misconduct. Instead, the Bank argues that the judgment was in error because the Guarantors waived all their defenses under the guarantee agreements. We disagree.

Civil Code section 2856 provides that any guarantor or other surety, including a guarantor of a note secured by real property, may waive rights and defenses that would otherwise be available to the guarantor. (See *Gramercy Investment Trust v. Lakemont*

---

[13] The auction of the units, one of the bullet items in Whalen's e-mail, did not take place, but that was due to the Bank's act of preventing performance, by demanding refund of the advertising budget.

*Homes Nevada, Inc.* (2011) 198 Cal.App.4th 903, 911.) Waivable defenses include the guarantor's rights of subrogation, reimbursement, indemnification, and contribution (Civ. Code, § 2856, subd. (a)(1)); any rights or defenses the guarantor might have by reason of any election of remedies by the creditor (Civ. Code, § 2856, subd. (a)(2)); or any rights or defenses the guarantor might have because the principal's obligation is secured by real property or an estate for years (Civ. Code, § 2856, subd. (a)(3)). These statutory rights of the guarantor may be waived and such waiver provision is not invalid as opposed to public policy. (*Wiener v. Van Winkle* (1969) 273 Cal.App.2d 774, 787, citing *Engelman v. Bookasta* (1968) 264 Cal.App.2d 915, 917 [guarantor can validly waive the protection provided by sections 2845 and 2849 of the Civil Code].)

However, a guarantor cannot be held liable where a contract is unlawful or contravenes public policy. (Civ. Code, § 1667; *WRI Opportunity Loans II, LLC v. Cooper* (2007) 154 Cal.App.4th 525, 545.) The rule against enforcement of illegal transactions is founded on considerations of public policy that are independent of Civil Code sections 2809 and 2810. (*WRI Opportunity Loans II, LLC v. Cooper*, *supra*, at p. 545.) Using this reasoning, it has been held that a pre-default waiver of notice by a guarantor is unenforceable as void. (*Cerritos Valley Bank v. Stirling* (2000) 81 Cal.App.4th 1108, 1114-1115.)

We deal here with the pre-default waiver of the Bank's own misconduct, which is not expressly waived in the guaranty agreement. We have found no cases on point addressing the availability of equitable defenses to Guarantors whose contractual

39

guaranty has waived specific legal defenses. We read Civil Code section 2856 to permit a guarantor to waive certain legal and statutory defenses, as specified in the code that would otherwise be available. Those statutory defenses have been set forth above. But we do not read Civil Code section 2856 to permit a lender to enforce pre-default waivers beyond those specified, where to do so would result in the lender's unjust enrichment, and allow the lender to profit from its own fraudulent conduct.

We therefore hold that a guarantor's waiver of defenses is limited to legal and statutory defenses expressly set out in the agreement. A waiver of statutory defenses is not deemed to waive all defenses, especially *equitable defenses*, such as unclean hands, where to enforce the guaranty would allow a lender to profit by its own fraudulent conduct. The doctrine of unclean hands bars a plaintiff from relief when the plaintiff has engaged in misconduct relating directly to the transaction concerning which suit is brought. (*Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 638-639.) Although originally an equitable defense, it may apply to legal claims, as well. (*Jacobs v. Universal Development Corp.* (1997) 53 Cal.App.4th 692, 699.)

Faced with this question for the first time, we apply a rule of strict construction to contractual pre-default waivers by the Guarantors. While broad in scope, such waivers are limited to those legal or statutory defenses particularly set forth in the guaranty agreement and do not constitute a waiver of all equitable defenses. In fact, the waiver provision of the guaranty agreement specifically states, "Except as prohibited by

40

applicable law, Guarantor waives . . . ." This language contemplates the retention of defenses, the pre-default waiver of which would be contrary to public policy.

In all suretyship and guaranty relations, the creditor owes the surety a duty of continuous good faith and fair dealing. (*Sumitomo Bank of California v. Iwasaki* (1968) 70 Cal.2d 81, 85.) This duty was not waived by the Guarantors in the agreement. The trial court found that public policy precluded an interpretation of the guaranty agreement that resulted in a waiver of *all* defenses. We agree.

Public policy requires us to read Civil Code section 2856 in a manner that prevents one party from capitalizing upon its own fraud or willful misconduct. (See Civ. Code, §§ 1667, 1668.) As the trial court pointed out, it would be in violation of public policy to enforce the Guarantor's waivers of defenses to payment of the note where the Bank willfully breached of the loan agreement, causing the default. There was no error.

F. *Attorneys' Fees Awards.*

The Bank argues that the awards of attorneys' fees to Advent and the Guarantors should be reversed because the court erred in entering judgment against the Bank on their claims. Because we have affirmed those judgments, we do not address this point. Alternatively, the Bank argues it was error to award attorneys' fees against the Bank to Advent under the attorney fee provisions in its construction contract, because the attorneys' fee provisions of that contract do not apply to this matter. The Bank also argues that both attorneys' fees must be adjusted. We disagree.

41

(1). *Bank's Challenge to Advent's Right to Attorneys' Fees Was Forfeited.*

The Bank argues the trial court erroneously awarded Advent attorneys' fees by incorrectly stating that the construction contract provided for an award of attorney fees. It raises this argument for the first time on appeal, so we need not consider it. (See *Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 776-777.) In the lower court, the Bank opposed only Advent's calculation of attorneys' fees, conceding Advent was entitled to such fees.

The rule that contentions not raised in the trial court will not be considered on appeal is founded on considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law. (*Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 587.) It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the court, could have been easily corrected or avoided. Otherwise, opposing parties and trial courts would be deprived of opportunities to correct alleged errors, and parties and appellate courts would be required to deplete costly resources to address purported errors which could have been rectified in the trial court had an objection been made. (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799-800.)

Here, it would be unfair to Advent and to the trial court to allow the Bank to withdraw its concession that Advent was entitled to fees. In its opposition to Advent's motion, the Bank argued, "Advent's request for fees is unreasonable and should be reduced by this Court. While *Advent is only entitled to fees for its breach of contract*

42

*cause of action*, Advent seeks fees relating to several other claims." On the next page of its opposition, the Bank argued, "Under the law and the Court's judgment, Advent is only entitled to recover attorneys' fees relating the prosecution of its breach of contract claim." Simply stated, the Bank invited the error.

The doctrine of invited error is an application of the estoppel principle: where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal on appeal. (*San Mateo Union High School Dist. v. County of San Mateo* (2013) 213 Cal.App.4th 418, 436.)

If the Bank had objected to Advent's entitlement to attorneys' fees under the construction contract, Advent would have had the opportunity to argue that the Bank's e-mail promising to get the subcontractors "paid current" constituted a novation of the construction loan agreement, making Advent a party to the loan agreement and entitled to claim attorneys' fees under it. (*Vallely Invs. v. Bancamerica Commercial Corp., supra,* 88 Cal.App.4th at p. 822.) Additionally, Advent could have brought to the trial court's attention the fact that the construction contract entitled it to prejudgment interest on the unpaid sums under the contract from the date the payment is due at the legal rate, rather than on the discounted amount from the date the complaint was filed.

We recognize that there are exceptions to the rule of forfeiture, such as when the new theory pertains only to questions of law based on undisputed facts. (*City of Scotts Valley v. County of Santa Cruz* (2011) 200 Cal.App.4th 97, 125.) But even then, whether an appellate court will entertain the new theory raised for the first time on appeal is

43

strictly a matter of discretion. (*Ibid.,* citing *Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 783, fn. 7.) Because the Bank invited the error of which it now complains, and because its willful misconduct led to Advent's involvement in this action, there are few equities in its favor. We decline to exercise our discretion to reach the question.

(2). *Whether the Attorneys' Fees Awards Were Unreasonable.*

The Bank argues that both awards should be adjusted. It fails to discuss the trial court's reasons for the awards, and makes a perfunctory argument that the awards improperly included fees for work for which there is no statutory basis for an award of attorneys' fees. We disagree.

In awarding attorney fees, the trial court has broad discretion to determine the reasonableness of the fees claimed in light of a number of factors, including the nature of the litigation, its difficulty, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances. (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 873.) The experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong. (*Ibid.,* citing *Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)

It is true that when a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the

44

prevailing party may recover only on the statutory cause of action. (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 686-687 (*Bell*).) However, the fees claimed in this case were not provided by statute, but, rather, by contract. Nevertheless, the joinder of causes of action should not dilute the right to attorney fees. (*Ibid.,* at p. 687, citing *Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133.)

In *Bell,* the court reversed an attorney fee award because the block billing made it impossible for the court to apportion the fees between a cause of action alleging a Ralph M. Brown Act (Gov. Code, § 54950) violation for which statutory fees are allowed and other causes of action. (*Bell, supra,* 82 Cal.App.4th at p. 689.) However, *Bell* does not hold that block billing is never appropriate. (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1010.)

Attorneys' fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed. (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 250.) Importantly, apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units. (*Ibid.,* citing *Bell, supra,* 82 Cal.App.4th at p. 687; *Maxim Crane Works, L.P. v. Tilbury Constructors* (2012) 208 Cal.App.4th 286, 298.)

The Bank argued at the hearing on the motion for attorneys' fees that the fees should be apportioned between contract and noncontract claims, and trial work versus

pretrial work. However, the court rejected this argument "because I think the stop notice and all that type of litigation was interwoven and can't be extracted from the contract part." The court carefully examined the billings of counsel and made an award of attorneys' fees in favor of Advent and the Guarantors based on consideration of all appropriate factors.

There was no abuse of discretion in calculating the amounts of the respective attorney fee awards.

2. *Advent's Cross-Appeal*

In its appeal, Advent argues that its unbonded stop notice was enforceable against the Bank and is an alternative basis for the judgment. We affirm.

The Legislature created the stop notice law to protect the claims of laborers and materialmen and give them priority over lenders to payment from the construction loan fund.[14] (*Brewer Corp. v. Point Center Financial, Inc.* (2014) 223 Cal.App.4th 831, 843; *Familian Corp. v. Imperial Bank* (1989) 213 Cal.App.3d 681, 684.)

A stop notice, or stop payment notice, as it is now called, is purely a remedy created by statute. (*Connolly Development, supra,* 17 Cal.3d at p. 809; *Mechanical Wholesale Corp. v. Fuji Bank, Ltd.* (1996) 42 Cal.App.4th 1647, 1657.) It is a written demand by a claimant on the owner, construction lender, builder's control, or other

---

**14** Prior to 2010, the statutory provisions relating to stop notices were found in Civil Code sections 3082 through 3267. In 2010, the Legislature repealed former title 15, and replaced it with a new Part 6, Civil Code sections 8000 through 9566. The new statutes are the same in substance. For ease of discussion, we will refer to the former statute numbers, in effect at the time of trial.

custodian of the construction funds, to withhold the sums claimed by a claimant from the sums due to the direct contractor or owner.  (Civ. Code, former §§ 3158, 3159; 10 Miller & Starr, Cal. Real Estate (3d ed. 2012) § 28:68, p. 28-235.)  The statute is remedial and must be liberally construed to effect its objects and to promote justice.  (*H.O. Bragg Roofing, Inc. v. First Federal Sav. & Loan Assn, Inc., supra,* 226 Cal.App.2d at p. 27.)  A stop notice constitutes a form of garnishment.  (*Connolly Development, supra,* at p. 813.)

The filing of a stop notice is a form of garnishment.  (*Connolly Development, supra,* 17 Cal.3d at p. 813.)  When a stop notice is filed, the lender, threatened with personal liability if it disregards the notice, may divert credit needed to pay for future construction to comply with the stop notice claim.  (*Ibid*.)  A stop notice establishes a lien on unexpended construction funds and is an independent but cumulative remedy available to contractors.  (*Cal Sierra Construction, Inc. v Comerica Bank* (2012) 206 Cal.App.4th 841, 848, citing *A-1 Door & Materials Co. v. Fresno Guar. Sav. & Loan Assn.* (1964) 61 Cal.2d 728, 732.)  In this way, the lien survives foreclosure of a trust deed.  (*Mechanical Wholesale Corp. v. Fuji Bank, Ltd., supra,* 42 Cal.App.4th at p. 1654.)

A contractor may serve a stop notice on the owner or any construction lender.  (Civ. Code, former §§ 3158, 3159.)  Upon receipt of the notice, an owner must withhold sufficient funds to pay the claimant.  (Civ. Code, former § 3161; *Cal Sierra Construction, Inc. v. Comerica Bank, supra,* 206 Cal.App.4th at p. 848.)  Upon receipt of a stop notice, the lender may, and upon receipt of a bonded stop notice the lender shall, withhold from

the borrower or other person to whom it or the owner may be obligated to make payments, sufficient money to answer the claim. (Civ. Code, former § 3162.) A construction lender is required to do so only if the notice is accompanied by a bond. (Civ. Code, former § 3162.)

When the claimant does not serve the appropriate bond with the stop payment notice, the lender may withhold funds in response to the notice, but it is not required to do so and may elect not to withhold funds in response to the stop payment notice. (10 Miller & Starr, Cal. Real Estate, *supra,* § 28:74, p. 28-249; *Manos v. Degen* (1988) 203 Cal.App.3d 1237, 1240.) The purpose of requiring a bond with the stop payment notice is to protect the owner, direct contractor, or lender against any losses or damages caused by improper service of the notice. (*Miller v. Mountain View Sav. & Loan Assoc.* (1965) 238 Cal.App.2d 644, 658.)

However, the requirement of a bond may be waived, expressly or impliedly, by the lender. (10 Miller & Starr, Cal. Real Estate, *supra*, § 28:74, p. 28-250.) The doctrines of estoppel and unjust enrichment have been applied to an unbonded stop notice claim, where the lender had assured the roofing contractor of payment. (*Nibbi Brothers v. Home Federal Sav. & Loan Assn., supra,* 205 Cal.App.3d. at p. 1421; *H.O. Bragg Roofing, Inc. v. First Federal Sav. & Loan Assn., supra,* 226 Cal.App.2d at p. 28.) "Section 3264 surely was not intended to give lenders impunity to pursue any stratagem at the expense of contractors and subcontractors." (*Nibbi Brothers v. Home Federal Sav. & Loan Assn., supra,* at p. 1422.) Thus, the abolishment of the equitable lien does not preclude all

theories of lender liability that may be based on a claim against the lender's general assets due to its wrongful conduct. (10 Miller & Starr, Cal. Real Estate, *supra*, § 28:75, p. 28-255.)

The record here would support a finding that the Bank has waived the bond requirement and by its conduct should be estopped to rely upon the lack of bond as a defense to its failure to honor the stop notice. However, Advent expressly and unequivocally waived any estoppel argument or theory pertaining to the unbonded stop notice. Having removed from our consideration the issues of waiver and estoppel, we must affirm the judgment.

## III.

## DISPOSITION

The judgment is affirmed in full. Advent and the Guarantors are awarded costs on appeal.[15]

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

KING
J.

MILLER
J.

---

[15] In the interests of justice, we award Advent all of its costs on appeal, despite the affirmance of the judgment in its appeal. (*Stuckey v. Stuckey* (1964) 231 Cal.App.2d 382, 387.) Advent's success on the balance of the appeal outweighs the loss on its appeal, and the equities are in its favor.